UNITED STATES, Appellee

v.

EUGENE ARMSTRONG, Private First Class, U. S. Army, Appellant

4 USCMA 248, 15 CMR 248

No. 2926

Decided May 7, 1954

LT COL Herman P. Goebel, Jr., U. S. Army, and 1ST LT David J. Conroy, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The issue of sufficiency of the evidence to support findings has been raised by the accused's petition in this case. An Army general court-martial had found him guilty under a specification alleging housebreaking, in violation of the Uniform Code of Military Justice, Article 130, 50 USC § 724. He was sentenced to receive the maximum punishment imposable for this offense —and the convening authority approved the findings, although he reduced the sentence. Affirmance by a board of review in the office of The Judge Advocate General followed.

II

The prosecution's evidence left little doubt that on the night of December 8, 1952, Post Exchange Number 8, Camp Atterbury, Indiana, had been entered unlawfully by some person or persons with intent to steal property located therein. A Criminal Investigation Division agent expressed the opinion that the entry and subsequent rifling had probably occupied "a good hour." In seeking to establish that the accused was the culprit, the Government enjoyed a less secure footing than in its showing that the crime had been committed by someone. In fact, it was compelled to rely almost wholly on the testimony of one Corporal Willie Evans, whom trial counsel characterized as his "star witness," and who was, in fact, the Government's sole witness on the issue of identity. The testimony of Evans must be set out in some detail for the reason that counsel for the accused before this Court contend chiefly that this evidence was self-contradictory and insufficient to support the conviction. See Manual for Courts-Martial, United States, 1951, paragraph 153a.

This soldier's testimony indicated that at 10 o'clock p.m. on December 8, 1952, he had begun a four-hour tour as guard at Post Exchange Number 8. He "was making a telephone call at a quarter to 1" when he "heard a peculiar noise inside the PX, like someone was walking." From the telephone— which was located outside the Exchange and on its west side—Evans walked around the building and, looking through its east door, saw two persons within. To his "idea of thinking," Evans "recognized" one of these as the accused, Armstrong. The persons inside the Exchange raised their hands, and one of them shouted, "Don't shoot. It's me." According to Evans, he was afforded some visibility by a light "right in the middle of the PX," and by a firelight situated outside it and near the east door.

He stated that he directed the men to halt, but that he could not hear what they were saying within the building. The corporal then left the two intruders without entering the Exchange—and apparently without seeking ingress through the east door—and went to the other side of the building. While he executed this maneuver, the intruders seem to have effected an exit—although they were not detected by Evans as they did so. A few moments thereafter he heard a further sound—apparently one of men talking—in the boiler room of Barracks 851. This structure was located some thirty yards across the street from the Exchange building, and housed soldiers from the company to which both Evans and the accused were assigned. On investigation, the former discovered the accused and another soldier, one Gayles. The latter was a conspicuous absentee from the witness stand at the trial.

Evans "asked them why they break in the PX," but "they didn't say anything." Evans did not report these unusual events promptly, since "at the time I was afraid." However, on returning that night to Barracks 852, in which both he and the accused were

250

quartered, he awoke the accused and asked "the same question, why he break in the PX." The accused, who was "not exactly . . . fully awake . . . didn't say nothing," and instead "turned over and went to sleep."

The substance of the foregoing testimony was elicited by trial counsel during the course of an exceedingly laborious and difficult direct examination. Near the close of that examination, trial counsel—perturbed at the witness' failure to testify as anticipated—sought to refresh his recollection by means of a statement made to the Criminal Investigation Division shortly after the incident. However, the effort was abandoned because of adverse rulings by the law officer. During the remainder of the direct examination, trial counsel elicited testimony to the effect that, when Corporal Evans had seen them in the boiler room, the accused and Gayles had in their possession a cardboard box of the sort normally used as a carton for cigarettes.

Defense counsel brought out on cross-examination that Evans was some five or ten feet from the men he purported to recognize in the Post Exchange. Cross-examination also disclosed that, although "walking down fast," Evans required "two minutes" to circumnavigate the Exchange Building after locating the intruders; that he had seen no one enter or leave the structure during any relevant period of time; and that he "wouldn't say exactly that it was Armstrong" whom he had seen in the Exchange.

Thereafter trial counsel sought to rehabilitate his witness, and again to refresh his recollection. Understandably discouraged by failures in these projects, counsel then requested—and was granted—permission to cross-examine Evans as a hostile witness. In the course of the ensuing interrogation, the witness explained that, under his own unique usage of "recognize," the term meant substantially "you are not too sure—but not sure" who the person is. "My idea of recognizing I am not too sure of a person." The corporal also revised certain of his previous testimony. For example, he testified that, while in the boiler room, he had in-

quired of Gayles and the accused what they had taken from the Exchange. The accused—who was at least an acquaintance and apparently a friend of Evans —said nothing. However, Gayles made some reference to having secured cigarettes—but, on objection, this testimony was stricken as hearsay.

In elaboration of his version of the Post Exchange episode, Evans testified that, when one of the persons within had said "Don't shoot. It's me," Evans had asked " 'Who is me?' And he said 'Armstrong'." The very considerable elusiveness of this witness' responses can scarcely be made palpable in this opinion's account of his testimony. Yet it was so marked and obvious at the trial as to prompt a request from the president of the court "that the law officer explain the meaning of perjury to the witness." The law officer complied with this demand, but properly disclaimed any wish or intent to offer his own views concerning the witness' credibility.

Following this warning, further fruitless examination ensued. Thereafter the court put a number of questions and brought out that both men seen in the Post Exchange, and both soldiers found in the boiler room, were wearing fatigue uniforms. Corporal Evans left little doubt of his certainty that the persons seen in the boiler room were in fact Gayles and the accused. In his replies to questions from court members, the witness pointed out that, due to rain and a high wind, audibility was poor on the night in question—with the result that he was in some doubt as to his ability accurately to have heard the man in the Post Exchange identify himself as Armstrong.

From the witness stand the accused flatly denied that he had broken into the Exchange; that he had been in the Exchange building at any material time on December 8th; and that he had seen Corporal Evans in the boiler room, as the latter had testified. An alibi for the accused was in part corroborated by another defense witness. Through various photographs received in evidence, the defense sought to show the implausibility, if not the impossibility, of Evans' account that he had "recog-

nized" one of the trespassers within the Exchange—even within the framework of the guard's peculiar definition of the word, "recognize." The accused's commanding officer, and various documentary exhibits, attested to his prior good character and to the efficient performance of his military duties.

## III

The witness, Evans', manifest reluctance to testify fully—an unwillingness which amply justified the law officer in granting trial counsel permission to examine Evans as a hostile witness— poses a critical problem in this case. If we were to rely on excerpts from his testimony, and to ignore the remainder, we would experience no difficulty whatever in sustaining the conviction. This testimony, at the very least, indicated that the accused resembled one of the pair seen within the Exchange building. A voice from within that building had also described the speaker as "Armstrong," when identification was requested. While an effort to conceal identity might provoke a false answer to such a demand, we believe that, within the context of the present evidence, the court more reasonably might have inferred that one named Armstrong was within the building. Despite the presence of other soldiers of that name at Camp Atterbury, the profusion of such persons would scarcely have been so great as to suggest that the speaker in the Exchange was an Armstrong other than the accused. Moreover, since the accused and Evans knew each other well, it would appear unlikely that one other than the accused would choose that particular pseudonym for the purpose of concealing his true identity— this for the reason that by such a choice he would enhance the risk that his guile would be discovered.

As to the boiler room incident, we deem it significant that the accused and another person, both ▬▬▬ ▬ dressed in clothing like that of the Exchange's invaders, were inexplicably found at a late and unusual hour in the boiler room of Barracks 851. Some doubt arises concerning the inferences, if any, which may be drawn from the accused's conduct in the boiler room. The Government has attempted to rely on this conduct as constituting an admission by silence. Yet in this connection, the Manual for Courts-Martial emphasizes that "Mere silence on the part of an accused when questioned as to his supposed offense is not to be treated as a confession." Paragraph 140a. Indeed any other rule would violate the manifest policy of Article 31 of the Code, supra, for—if incriminated by reliance on his right to remain silent —an accused would indirectly be compelled to speak. In fact, the defense might conceivably have argued that the instant situation should be assimilated to one involving a suspected person "under investigation"—since Evans had been assigned as a guard at Post Exchange Number 8 and its environs and was on duty at the time of the incident. Manual, idem. However, we note that, although on tour as a guard, Evans was also a barracks mate of the accused, and apparently his friend. In addition, that he was unmotivated on the night in question by any concept of official duty is strongly suggested by his subsequent failure, when relieved as guard, to report the unusual events which had characterized his tour of duty.

Not inappropriately, the framework within which the conversation between Evans, Gayles, and the accused took place in the boiler room may be analogized to that found in United States v. Creamer, 1 USCMA 267, 3 CMR 1. In that case we concluded that the informality of a discussion between the accused and a military policeman permitted reception in evidence of an admission made by the former, although no warning of his right to remain silent had preceded the statement. Similarly here—and especially in light of an absence of objection at the trial to consideration of any admission by silence —we believe that a court-martial might reasonably have inferred that accused, were he innocent, would forthwith have denied the accusation implicit in the remark of his friend, Evans. See Manual, supra, paragraph 140a. To us no similar inference seems available with

respect to the accused's silence when Evans awakened him in their barracks near two o'clock a.m. and inquired of the housebreaking. At such a time and under such circumstances taciturnity would seem the rule rather than the exception.

Another source of inference of the accused's guilt lay in the contradiction between his alibi testimony, on the one hand, and Evans' statements, on the other—a contradiction which compels the conclusion that one or the other palpably was false. Since the court chose to consider Evans the more credible witness, the imputed fabrication on accused's part would lead to an inference that his untruthfulness was motivated by a desire to conceal guilt—guilt, of course, of the offense charged. This inference, like that stemming from any other type of implied admission, would serve to bolster substantially the court's finding of guilt.

## IV

Having concluded that, through culling the guard's testimony selectively, the conviction may be upheld with ease, we must inquire into the extent to which this result will be affected by an examination of Evans' testimony *as a whole*. Such a consideration seems demanded by the Manual's provision that a "conviction cannot be sustained solely on the self-contradictory testimony of a particular witness, even though motive to commit the offense is shown, if the contradiction is not adequately explained by the witness in his testimony." Manual, supra, paragraph 153a. It will be noted that the contradictions in Evans' testimony did not arise by virtue of conflicting statements concerning the persons seen in the boiler room. Cf. United States v. Spencer, 68 BR 243. Instead these "contradictions" related chiefly to the degree of positiveness manifested in his assertions. Variations in testimony along such lines may be attributable to several factors. The most obvious, we suppose, would take the form of either a poor recollection or a conscious wish to prevaricate. Also— understandably and unavoidably—a witness must experience some hesitancy in testifying against a friend charged with a serious offense. Next is the possibility that Evans had been threatened either by the accused or by Gayles, and wished to protect himself against violence. And finally we must face the notion that he may have aided and abetted in the housebreaking, and wished to protect himself from the prosecution which would follow disclosure of his true role.

The opportunity personally to observe a witness must play a powerful part in any determination of the causes for that witness' inability to present a clear account of significant evidence—and we are required to accord great deference to the court-martial's implicit conclusion concerning the respective credibility of Evans and the accused. Also the very provision for examination of a hostile witness by means of leading questions envisions some degree of self-contradiction or reluctance on the part of a witness to furnish testimony. Under normal circumstances a witness will not be declared hostile until his testimony has revealed unfriendliness, or has disclosed a departure from positions taken in pretrial statements. The function of leading questions, of course, is to discover whether, on searching inquiry by the examiner, the witness will reveal further details, remove ambiguities, or revert to his previous position. Not infrequently—and especially if the use of leading questions serves the purposes of the examiner—some conflict and self-contradiction will develop in the witness' testimony. This conflict may exist as to the degree of positiveness with which he is willing to testify to questioned transactions, or with respect to those items which, in accord with his oath or affirmation, the witness asserts to be "the whole truth" concerning the subjects about which he is testifying. In short, when hostile witnesses are used, elements of self-contradiction almost necessarily lurk in their testimony. If too broad an interpretation be adopted for the principle that a finding may not be based on the self-contradictory testimony of a single witness, we shall for many purposes be

**253**

holding that convictions cannot be secured if all witnesses are hostile. Such a holding would not, we believe, accord with trial realities, and would often render nugatory that provision of the Manual which authorizes counsel to examine with leading questions those of his witnesses who prove to be hostile. Manual, paragraph 149c(1)(b).

Moreover, although Corporal Evans greatly qualified and limited his statement that he "recognized" the accused in the Exchange, similar qualifications were not placed by him on testimony to the effect that, shortly thereafter, he had seen the accused and Gayles in the boiler room of a nearby barracks, and that at the time he had—impliedly at least—accused them of housebreaking. Thus, on the night of December 8, Evans appears to have had enough confidence in his original identification of the accused to make this serious, albeit informal, accusation in the latter's presence. Analytically, Corporal Evans' accusation of the accused—disassociated for the moment from any admission by silence—was equivalent to a statement by the former that he had seen the latter in the Exchange. Despite the general principle that "a person gains no corroboration merely because he repeats a statement a number of times" —Manual, supra, paragraph 153a—we are sure that this original identification in the boiler room of the accused as one of the persons earlier trespassing in the Exchange, was admissible in and of itself. It was admissible, we believe, to alleviate the ambiguity resulting from Evans' confused interpretation of his judicial statement that he had "recognized" the accused. Reception of Evans' testimony that he had asked the accused and Gayles why they had illegally entered the Exchange, while the witness was on guard, falls—in policy and perhaps in terms— within the Manual's rule that evidence of a previous extrajudicial identification may be used to corroborate a judicial identification of an accused. Manual, idem.

V

The instant case is a close one. However, we were not members of the court-martial which heard the testimony of the witnesses—and observed their respective appearances and deportments. Moreover, we do not sit as members of a board of review with power to pass on the "weight of the evidence." We shall not, therefore, reappraise the determinations of credibility made in these forums. United States v. Schultz, 1 USCMA 512, 4 CMR 104; United States v. Stewart, 1 USCMA 648, 5 CMR 76. Nor do we feel that certain inconsistencies on the part of the witness, Evans, were of such a nature and of such magnitude that, as a matter of law, they required disapproval of the court's findings. Accordingly, we must affirm the decision of the board of review.

Chief Judge QUINN and Judge LATIMER concur.