UNITED STATES, Appellee
v.
LEON B. TAYLOR, First Lieutenant, U. S. Army, Appellant

5 USCMA 775, 19 CMR 71

No. 5210

Decided May 13, 1955

Frederick Bernays Wiener, Esq., for Appellant.

Lt. COL William R. Ward, U. S. Army, LT COL Thomas J. Newton, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This officer case involves a charge of perjury. Despite his plea to the contrary, the accused, an Army lieutenant, was found guilty of this offense, in violation of Article 131, Uniform Code of Military Justice, 50 USC § 725. He was sentenced to be dismissed from the service, to forfeit all pay and allowances, and to be confined at hard labor for five years. Both the findings and the sentence were affirmed without modification by intermediate appellate authorities, but thereafter the accused's petition for review was granted by this Court, which limited briefs and argument to four issues, two of which are discussed below.

II

On the 6th and 7th of October 1953, the accused, Taylor, was acquitted by a general court-martial under charges specifying several crimes. One of these was based on an allegation that he had committed sodomy with an Army private named Mullen at Hanau, Germany, during the month of March 1953. At that trial, Mullen, the principal Government witness, testified that Taylor had accompanied him to Frankfurt, Germany, on March 28, 1953, and that the two had slept together that night in the neighboring town of Hanau, where the alleged act of sodomy took place. Taking the stand in his own behalf, the accused emphatically denied that he had accompanied Mullen to Frankfurt on the 28th or 29th of March, and insisted that he had served as officer of the day at his own station during this period—an assertion which, in light of the findings of not guilty, appears to have been believed by the initial court-martial.

The accused now stands convicted by a second general court under a specification alleging that he had testified under oath at the first trial that he "did not enter the city of Frankfurt, Germany, on 28 or 29 March 1953, which testimony was upon a material matter and which he did not then believe to be true." By offering in evidence excerpts from the record of the earlier trial, the Government established (1) the constitution of the previous court, (2) the taking of an oath by the accused, and (3) the testimony alleged to have been false. Private Mullen—appearing again as the chief Government witness—reiterated his former testimony to the effect that he and the accused had passed the night of March 28, 1953, together in a gasthaus near Frankfurt, Germany, and that the latter had committed an act of sodomy with him. According to Mullen, the two men arose early the following morning, March 29, visited an automobile show in Frankfurt, and returned to their organization the same afternoon.

The officers' register of the 1st Medical Battalion covering the period from March 26 to April 18, 1953, showed by means of an entry made at 12:15 p.m., March 28, the departure for Frankfurt of a Lieutenant L. B. Taylor, ASN 0980903—the accused's service number —and, by another, the same officer's return to his unit at 4:00 p.m., March 29. A further entry indicates that a certain Lieutenant Parker had served as officer of the day, and—pursuant to the customary practice of the command— had closed out the register at midnight on March 28. Moreover, a business entry from the record of fuel sales maintained by an Army filling station in Frankfurt reflected the sale there of thirteen gallons of gasoline to the accused on the afternoon of March 29. Testifying as a witness called by the court, Lieutenant Webster R. Parker stated that he and the accused had agreed to exchange tours as officer of the day during March and April; that he had performed duty as such on March 28; and that the accused, in return therefor, had served in the same capacity during the following week end, April 4-5. Although Lieutenant Parker had been designated officer of the day for April 4, the guard report of the battalion for the period April 4-5 appears to have been signed by the accused as officer of the day.

Taylor's defense to the Government's case followed the theory of alibi successfully advanced by him during the original court-martial trial. A warrant officer called Braxton remembered assisting the accused with certain accounts during a Saturday afternoon "the latter part of the month of March and sometime around the first of April," at which time the latter was serving as officer of the day. And two other defense witnesses recalled meeting Taylor in battalion headquarters on the afternoon of March 28. In addition, the Battalion Information Bulletin, dated March 26, published a paragraph directing the accused to serve as battalion duty officer on March 28; an extract from the duty roster of the 1st Medical Battalion indicated that the accused had served as such on March 28; and the Guard Report of the 1st Medical Battalion for March 28–29 appears to have been signed by the accused as officer of the day.

Electing to testify in his own behalf, the accused once more denied having traveled with Mullen either to Frankfurt or to Hanau on March 28, or 29, and insisted that he had performed duty as officer of the day during the week end in question. He had intended at one time to accompany Mullen to the motor show in Frankfurt, he said, but because of Lieutenant Parker's failure to relieve him of officer of the day duties, pursuant to their prior exchange agreement, he had been unable to leave the post for that purpose. He asserted that he performed duty as officer of the day on March 28, which included work on various accounts with the assistance of Mr. Braxton. Although at first blush he had been under the impression that he had not visited Frankfurt at any time on March 28 or 29, he later recognized his signature on the gasoline record mentioned earlier—and therefore "must have been" present there on March 29. However—he stated—when at the first trial he had denied going to Frankfurt, he honestly thought that he had not done so, but by reason of his signature on the gasoline sales slip he later came to believe that he must have been mistaken in his original testimony. It would have been possible, of course, to make the journey in question after completion of service as officer of the day early on March 29.

After all evidence had been presented, the law officer instructed the court-martial, *inter alia,* to the effect that the defense had raised the issue of mistake of fact; and that, if the court-martial believed that the accused was mistaken, and that his mistake was honest *and reasonable* under the circumstances, then its members should find him not guilty of perjury. The court-martial retired, and shortly thereafter convicted the accused under the specification and charge.

After the record in the present case had reached this Court, the accused submitted a petition for a new trial, pursuant to the provisions of Article 73, Uniform Code of Military Justice, 50 USC § 660—which document has been forwarded to us for consideration. Attached thereto are nine affidavits which, it is contended, constitute newly discovered evidence pointing in the direction of the accused's innocence, and which indicate that a fraud was perpetrated on the court-martial. Specifically, the petition complains that the accused, despite the exercise of due diligence, had been unable to locate before the date of the second trial seven of the witnesses whose attached affidavits support his alibi—namely, that he had served as officer of the day on March 28 and 29. Further, it is claimed that the Government had deliberately denied him access to certain records of importance to his defense; that the testimony of two defense witnesses had been unfairly shaken by means of a polygraph test compelled by criminal investigators; and that the Government had conducted a pretrial round-table conference of prospective witnesses—badgering those favorable to the defense and probably suborning others. On the basis of information contained in the supporting affidavits—the petition concludes—a substantially different result would doubtless be reached at a new trial.

### III

The first issue raised by the petition for grant of review requires that we

consider whether the evidence before the court-martial met the "qualitative test" for perjury. Both appellate Government and defense counsel appear to find no quarrel with the firmly established rule that the falsity of an allegedly perjured statement is not provable by the testimony of a single witness—uncorroborated by other testimony or by circumstances tending to establish untruth. Manual for Courts-Martial, United States, 1951, paragraph 210. Weiler v. United States, 323 US 606, 89 L ed 495, 65 S Ct 548. Rather, it is the defense's contention that the *quality* of the evidence of falsity here was not sufficiently "strong and clear" to meet the test universally applied in Federal courts. The witness Mullen—the argument runs—admitted to several perjured statements; and other Government witnesses were evasive, forgetful and unconvincing. Counsel conclude that the falsity of the appellant's statement denying his presence in Frankfurt on March 28 was not established by evidence which meets the qualitative standard required in perjury cases—and that the untruthfulness of his further statement that he was not present there on March 29 was not wilfully conceived.

Assuming, without deciding, the correctness of the defense's "qualitative test" for evidence sufficient to sustain a perjury conviction, we are nevertheless sure that in this setting, at least, the proposed standard was fully met. Basic to a determination of this issue is the testimony of the Government's principal witness, Private Mullen. His testimony—unshaken by vigorous and searching cross-examination—was to the effect that he and the accused had motored to Frankfurt on the afternoon of March 28, 1953, that they had lodged together that night in a nearby gasthaus, and that they had there participated in an act of sodomy. The following day—according to the witness—both had visited an automobile show in Frankfurt, returning to their military station during the afternoon of March 29. It is obvious that the facts recited by Mullen are irreconcilable with the accused's account of his whereabouts on the two days in question. Consequently, Mullen's testimony may be said to establish the untruthfulness of the accused's prior statements under oath—if that testimony is credible as a matter of law, and if falsity is shown by other witnesses or by corroborating circumstances.

We must warn at the outset that credibility is a matter within the province of the triers of fact, and that this Court may not permissibly reappraise the court-martial's determinations in this area. United States v. Armstrong, 4 USCMA 248, 15 CMR 248. Since we were not afforded an opportunity to observe Mullen's demeanor and deportment on the stand, of necessity we must accord great deference to the court-martial's implicit conclusion with respect to his credibility. Moreover, the record reveals a chain of circumstances which compels us to conclude that the initial determination of Mullen's trustworthiness rested on firm ground. The Government placed in evidence a pass issued to him which permitted a visit to Frankfurt, together with an automobile show ticket stub and a unit register bearing his outgoing signature as of 12:20 p.m., March 28, naming Frankfurt as his destination. Additional corroboration of Mullen's statements was furnished by the testimony of the accused himself, who recalled a plan to attend the automobile show in his company. Moreover, the accused conceded signing the officers' register at 12:15 p.m., March 28, on a VOCO to Frankfurt, and admitted that he had purchased gasoline in Frankfurt on March 29. In considering these facts—as its members must have done—the court-martial understandably found Mullen's recollection of events not unworthy of belief. Indeed, it is doubtful that a contrary result would have been reached by most courts-martial.

Although Mullen admitted that his statement made to the investigating officer prior to the first trial—which statement denied the act of sodomy—was in large part false, he stated that he was then motivated by a desire to protect both himself and Taylor. This seems an entirely credible explanation. Thereafter a grant of immunity served to loosen his tongue, however, and the

sordid details were brought to the court-martial's attention. It is true that this grant of immunity, resulting as it did in a change of testimony, weighs against credibility. At the same time we cannot say that this fact, standing alone and against the background of circumstances recounted in foregoing paragraphs, requires the rejection of Mullen's evidence as a matter of law.

Since the testimony of the "single witness," Mullen, is sufficiently convincing to meet the qualitative ■ test of appellate defense counsel, we turn now to the question of corroboration of the alleged falsity of the accused's statements. According to the defense argument, the "other evidence" of falsity presented by the Government is not only weak, but in fact tends to support Taylor's claim that he had told the truth. We cannot accept this contention—for the record itself offers a plethora of circumstances from which falsity of the accused's statements might have been inferred with safety.

Lieutenant Webster R. Parker, who had been designated officer of the day for the succeeding week end, had agreed to exchange tours of duty with the accused. Parker was, therefore, reasonably certain that he had served as officer of the day for the period of March 28 and 29. Parker's recollection, although admittedly not positive because of a time lapse of nine months, is nevertheless supported by the testimony of a Sergeant Gibson, who, as charge of quarters of March 28, remembered Parker as officer of the day. It will be recalled that the officers' register contained Parker's name as officer of the day as of midnight March 28—while the accused's signature, found in this same record, indicated a departure for Frankfurt on March 28 and a return to duty the following day. In addition, when faced with Parker's testimony and a documentary showing that a Lieutenant Taylor had performed duty as officer of the day on April 4—presumably to repay Parker—the accused could only explain that he must have performed duty on April 4 as well as on March 28 "rather than have any difficulty in the matter."

The most damaging blow to the defense case, however, took the form of the judicial admission by the accused that he "must have been" present in Frankfurt on March 29. Confronted with a record of gasoline sales from an Army filling station, located in that city, which reflected the purchase of fuel by a lieutenant, who signed himself as Lee Taylor, on March 29 at approximately 1:00 p.m., the accused admitted from the witness stand that the signature was his own, and that he must necessarily have been in Frankfurt on that date. He explained, however, that when he testified at the first trial, he had honestly believed the story he told, and that—mistakenly—he must have confused successive week ends. This admission—together with other evidence tending to disprove the accused's theory of alibi—constitutes sufficient proof of guilt safely to meet the corroboration requirement.

What indeed could amount to a clearer indication of falsity than an admission by the accused himself that he was present in Frankfurt on March 29, when, in prior sworn testimony, he had emphatically stated that he was not? Moreover, the presentation of conflicting documents and testimony by the defense did not serve to lessen materially the effect of these corroborative details. For one thing, Mr. Braxton, in the face of an exhaustive direct examination by defense counsel, refused to lend *complete* support to the accused's claim that the two had worked together on March 28. For another, the records introduced by the defense to establish the presence of Taylor as officer of the day on the week end during which the incident occurred appear to have been maintained in a lamentably slipshod manner, and —more significantly—had been within the exclusive control of the accused, who was their custodian. It cannot be denied that it would have been a simple matter for the accused to revise these records at will. In fact, the original report of the officer of the day for March 28 and 29 was never found—and in lieu thereof the accused sought to place in evidence a copy signed by himself and

authenticated by Mr. Braxton, the warrant officer who was his principal witness. Although certainly entitled to weight, the documents presented by the defense lack in substantial measure the probative quality we find in the Government's exhibits. In light of the foregoing analysis, we are sure that the Government's corroborative evidence lent "strong and clear" support to the testimony of Private Mullen. We, therefore, reject the defense claim of insufficiency.

## IV

We are next called on to decide whether the law officer's instruction with respect to an "honest ■ and reasonable" mistake of fact was prejudicial to the accused. It will be recalled that the latter testified in substance that at the time he uttered the allegedly false statement denying his presence in Frankfurt on March 28 and 29, he honestly, but mistakenly, believed it to be true. He must have confused successive week ends—he explained—because of the time-spread between March 28 and the date of the first trial. In presenting the defense of mistake of fact to the court-martial, however, the law officer directed that tribunal to reject this defense unless its members found the accused to have labored under a *reasonable* as well as an *honest* mistake. Appellate defense counsel now contend that this instruction requires reversal.

In United States v. Rowan, 4 USCMA 430, 16 CMR 4, we considered the accuracy of an instruction substantially identical to the one before us now. There, the accused was charged with larceny by check and defended on the ground that he had honestly believed that sufficient funds were present in the bank to cover the paper. We held that he might not lawfully be convicted of the offense with which he was charged in the absence of an establishment by the Government of a want of honest belief—however *unreasonable*—that the check he uttered would be paid on presentment. As we observe in the opinion, the mental attitude of one who makes a false representation will fall logically within one of three categories: (1) he may know or believe that the representation is false; (2) he may possess neither knowledge nor belief with respect to its truth or falsity; or finally (3) he may believe the representation to be true.

An invocation of these three classifications of state of mind may be of assistance in dealing with the present case, where the charge is one of wilfully and corruptly giving false testimony under oath. It is obvious that, if Taylor knew or believed the statements he made at the first trial to be false, perjury is established as a matter of law. The same result would follow if he had no knowledge or belief with respect to truth or falsity. However, Article 131 may not be extended to a situation in which an accused honestly believes his testimony to be true, although in fact his understanding is erroneous, or based on information which a reasonably prudent man would consider insufficient. To so broaden the Article's scope would be to substitute mere negligence for the specific criminal intent required by the statute which defines the crime of perjury.

In short, if we accept the instruction on mistake of fact as supplied by the law officer in the case at bar, we ignore the possibility that the *wilful* giving of false testimony may have been inferred by the court-martial from facts sufficient to establish only that which a reasonable person *should* have believed. In such a situation the mental attitude of the accused—honest although it may have been—becomes immaterial to a determination of the issue. We are sure that such a result is as undesirable here as we found it to have been in the Rowan case.

The great weight of civilian authority is in accord with the principles announced above. In fact, the rule seems clear that a false statement, which was the result of an honest mistake, may not be made the basis for a conviction of perjury. 70 CJS, Perjury § 17; Scott v. State, 66 Okla Cr App 441, 92 P2d 847; and see Seymour v. United States, 77 F2d 577 (CA 8th Cir). If the defendant here swore honestly—and with probable cause in accordance with his own lights and to the best of

his belief—he cannot be guilty of perjury, although his statement was, in fact, untrue. Wharton, Criminal Law, § 1513, and cases cited et seq; 41 Am Jur, Perjury § 10. One of the clearest expositions of the view held by civilian courts is found in Clark and Marshall, the Law of Crimes, § 446, page 644:

> "(d) *Knowledge and Intent.*—It is essential at common law, that the taking of a false oath shall be both wilful and corrupt. Testifying falsely by mistake however negligently or inconsiderately, is not perjury. For this reason, the fact that a person has given contradictory testimony on different occasions does not show that he has committed perjury, for he may, on each occasion, have believed his testimony to be true. It has been held that it is perjury for a witness to swear wilfully and deliberately to what is false, when he has no probable cause to believe it to be true, though he may believe it to be true, but this view cannot be sustained. A witness who states what he believes to be true cannot be guilty of *wilful* and *corrupt* false swearing, however negligent or careless he may be in his belief."

It is apparent that the common-law concept of wilful and corrupt false swearing constitutes an integral part of the Code's definition of perjury. There can be no doubt, then, that the mentioned civilian authorities are applicable to a determination of the mistake of fact issue found in the present proceeding. If this is true—and we expressly hold it to be—the court-martial could not properly have convicted the accused if its members found that his allegedly perjured statements were uttered with an honest belief as to their truth. But—as we have previously observed—the law officer removed this defense from consideration by his instruction to the effect that the mistake of fact must have been both honest and reasonable. In view of our own prior decisions—supported as they are by substantial authority from other jurisdictions—we must hold this instruction erroneous.

Appellate Government counsel insist, however, that no issue of mistake of fact was raised by the accused's statement that he had not traveled to Frankfurt on March 28, and that, therefore, he can have suffered no harm because of the erroneous instruction. We cannot accept this argument. Although Taylor testified consistently that he had served as officer of the day and was not present in Frankfurt on March 28, he admitted that he "must have been" there on March 29. However, he also swore that he genuinely believed the latter statement to have been true when he made it at the first trial. Thus, when the court-martial retired to deliberate on findings, conceivably it could have reached any one of three conclusions. First, it could have found that the accused was guilty of deliberate falsehood as to both statements—in which event the erroneous instruction would have been harmless. Second, it could have acquitted him of false swearing with respect to the statement involving March 29, but convicted him under that relating to the day before—and again no prejudice would have resulted from the defective instruction. Third, the court-martial may well have believed the accused's testimony that he had served as officer of the day on March 28—but, because of his judicial admission, could have found him guilty of perjury in denying his presence in Frankfurt on March 29. If the last result be taken to reflect the true nature of the court's findings, then beyond question the petitioner was prejudiced by the erroneous charge on mistake of fact.

Since the law officer did not limit the challenged instruction in any manner, and since the court-martial did not indicate which of the three possibilities mentioned above were reflected in its findings, we cannot say with assurance that the instruction complained of amounted to no more than harmless error. In fact, the third conclusion hypothesized may be said to be an entirely logical one. In admitting to false testimony regarding his presence in Frankfurt on March 29, the accused assured his conviction—unless his defense of mistake of fact was accepted. And it is distinctly possible that the court-martial

concluded that such a statement, although honest, was unreasonable and careless—with conviction following in short order. Certainly we cannot assert that this did not happen. However, when faced with the hotly contested issue of the accused's whereabouts on March 28, the court-martial could well have accepted the accused's evidence and upheld his claim of alibi. In any event, the possibility of such a finding is somewhat too strong to be ignored. We must therefore reject the Government's contention that the instruction under attack afforded no fair risk of prejudice to the accused.

V

Since reversal is required by our disposition of the instructional issue, no discussion of the remaining errors assigned in the petition for review is necessary to action in the present case. We may further observe in passing that the accused cannot be deemed entitled to more complete redress under his petition for new trial than that afforded by our present holding.

We have scrutinized with care the affidavits attached to the petition for new trial, and find nothing therein which serves to support a claim of jurisdictional defect. Accordingly, we are sure that our action here is sufficient to satisfy both prayers for relief.

VI

The decision of the board of review is reversed and a rehearing is ordered.

Chief Judge QUINN and Judge LATIMER concur.