UNITED STATES, Appellee

v

FRANCIS R. PATTERSON, Basic Airman, U. S.
Air Force, Appellant

7 USCMA 9, 21 CMR 135

No. 7493

Decided April 20, 1956

 ██

*Captain George M. Wilson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Lieutenant Colonel Roger H. Miller* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused Patterson, who alone appeals, was tried jointly with another airman, Kerry D. Gilbreath, and found guilty under two specifications, one alleging simple assault and battery, and the other stating an assault with a dangerous weapon, both in violation of Article 128, Uniform Code of Military Justice, 50 USC § 722. He was sentenced to a bad-conduct discharge, confinement for one year, and partial forfeitures for a like period. The convening authority approved the findings and sentence but suspended execution of the discharge. The board of review has affirmed. Finding no substantial question that affected Charge 1, we granted review on the following two issues concerning the second Charge:

(1) Whether the evidence is sufficient to sustain the finding of guilty on specification 2, assault with a dangerous weapon as to Patterson.

(2) Whether the instructions on the lesser included offense of assault and battery under specification 2 were sufficient as to Patterson.

The pertinent facts are these. On the evening of December 10, 1954, the victim, one Private First Class Basart, was seated with Corporal Hunter in the Airmen's Club, McAndrews Air Force Base, Newfoundland, when appellant and Gilbreath approached from the rear. Gilbreath was heard to say, "OK, Pat, the coast is clear, let's go." Thereupon appellant put his arm around Basart's neck and pulled him backward to the floor. While the victim was being held in a prone position, Gilbreath thrust a chair at him, striking him on the chest and face. After the incident, the two aggressors fled, and Basart reported the matter to the club manager.

A short time later, Corporal Hunter saw appellant and Gilbreath and asked them why they had attacked Basart. Gilbreath replied he did not like Basart's "Yankee looks." Another statement attributed to Gilbreath in that conversation was to the effect that he thought Basart was yellow for not coming out to fight. As the two accused left the scene of the encounter, and while proceeding to their barracks, they were overheard discussing their encounter with Basart. In the course

of their conversation, it was stated by one of them in a tone of voice loud enough to be heard by the witness that they were going to "get him." They continued to their barracks where they changed to what may aptly be described as more appropriate fighting clothes.

Hunter rejoined Basart in the snack bar, and in about twenty minutes the two accused reappeared and seated themselves at a table near the one being used by the former group. Hunter shortly thereafter left the table, and Gilbreath then approached the victim and challenged him to do battle outside the club. Basart refused to accept the challenge because, as he put it, he thought the challenger probably had fortified himself with a weapon and was well prepared for a fight. Upon ascertaining that Gilbreath was not armed, and after again being called "yellow," the victim decided that it was better to accept the challenge than to be assaulted later without warning. Upon his arrival outside, Basart removed his coat and the two began fighting. After a short skirmish, each having landed several blows, Gilbreath stepped back, took off a wide cowboy belt he was wearing, and wrapped all but eighteen inches of the strap around his hand. The belt was equipped with an unusually heavy buckle, which was approximately two and one-half inches long and two inches wide. Gilbreath, using the belt and buckle as one would use a flail, struck Basart several times in the face. Basart sought sanctuary inside the club, but as he was retreating up the steps, with Gilbreath in hot pursuit, appellant blocked the front entrance. Basart collided with him, and the three participants became jammed in the front doorway with this unusual result. Appellant had the victim's left arm twisted behind him, while the latter, in order to protect himself, attempted to hold Gilbreath with his right arm. While the three were thus struggling, Gilbreath, unable to continue striking Basart with the belt, and perhaps by way of variation, took a bite out of Basart's right ear. As some one came out of the club, the two accused fled and Basart was helped inside. Upon examination it was found he had suffered injuries to his ear, the bridge of his nose, and on his head. The cut across the bridge of his nose required five stitches.

## II

With respect to the first issue of evidential sufficiency, it is contended on behalf of the appellant that there is a difference between being present at the scene of a crime and aiding and abetting in its commission. In that regard, it is asserted that, in this instance, the evidence is insufficient to show that appellant's actions amounted to active assistance and encouragement of Gilbreath. To escape the effect of the aider and abettor rule of liability, appellant argues that, had the two accused intended to assault the victim with something other than their fists, they would have come armed with a weapon of some type, yet, the only preparation they made was to change clothing. From all of the foregoing, it is asserted the appellant did not share the criminal intent or purpose of his coaccused, and did not encourage or excite him to commit an aggravated assault.

The Government replies to those contentions by asserting that the appellant did far more than stand by. It seeks to bolster its premise by relating the succession of circumstances which point to a joint venture and a mutual agreement between the two accused to "get" the victim by whatever means they found necessary, including the means actually used. In addition, it points out that appellant returned with a crystallized purpose to assault the victim, and this, together with his participation in the first battery and his assistance in the second assault, establishes his culpability as an aider and abettor. Furthermore, it contends that the means used was fairly within the purview of their agreement, as is shown by the following closely knit, chronological sequence of events. After assaulting the victim with a chair, a means likely to result in grievous bodily harm, Patterson and Gilbreath remained together. They mutually agreed to do further bodily harm to Basart, and changed into suitable attire for fighting. The belt used was part of the apparel

worn by Gilbreath when they left the barracks to search out the victim. They returned together, a second fight was intentionally precipitated, and when the dangerous instrumentality was imported into the affray and the victim sought to flee, the appellant impeded his flight and held him while Gilbreath continued his assault with the weapon. When third parties appeared, the appellant fled.

The arguments advanced by accused seem to be founded on a misapplication of our previous holdings. ■■■■■ ■ In United States v Jacobs, 1 USCMA 209, 211, 2 CMR 115, we said:

"Inactive presence during the commission of an offense is clearly an insufficient link to guilt. The aider and abettor must share the criminal intent or purpose of the active perpetrator of the crime, and must by his presence aid, encourage, or incite the major actor to commit it. Morei v. United States, 127 F. 2d 827, 831, (C.A. 6th Cir.) See Manual for Courts-Martial, United States, 1951, paragraph 156. The proof must show that the aider or abettor did in some sort associate himself with the venture, that he participated in it as in something he wished to bring about, that he sought by his action to make it successful."

In United States v Wooten, 1 USCMA 358, 3 CMR 92, we developed another concept in the aider and abettor field, saying, "It is certainly a well-established rule of criminal responsibility that principals are chargeable with results which flow as natural and probable consequences of the offense subjectively intended."

When we apply the rule of those cases to the facts of the case at hand, we conclude the evidence is sufficient. Here we find that the appellant was present during the initial altercation, and that he participated in a full scale assault by holding the victim while his accomplice struck him. In that fight, Gilbreath chose a chair as the assault weapon, and that was actual notice to appellant that an instrument likely to inflict great bodily harm might be used by Gilbreath if

another assault resulted from the agreement to "get" Basart.

Throughout the period between the two offenses, appellant was in constant company with Gilbreath. His apparent willingness to join in further beatings of the victim, coupled with such acts as changing to more appropriate fighting togs and returning to seek out Basart, would encourage Gilbreath to believe that he would have a ready ally. Every act of the accused during that period was calculated to further the venture of getting the victim. His appearance in the doorway of the club in time to stop Basart's retreat seems to have been more than a mere happenstance. It is reasonable to infer in light of his previous preparation for a fight that he was watching and waiting in a strategic spot for the moment when his active participation would be required and have the most devastating effect. Regardless of his counsel's protests to the contrary, he actively assisted in inflicting the injuries on the victim by blocking entry into a place of relative safety, and by holding Basart while Gilbreath continued his assault with his teeth. Even when we interpret the evidence in a manner most favorable to the appellant, we are still forced to conclude that it would test the credulity of any reasonable man to find he did not knowingly and willingly join in the aggravated assault. In so concluding, we have not overlooked his contention that he could not foretell that an aggravated assault would ensue. He had participated in one assault which might fairly have been alleged as being of that character and heinousness, and he could reasonably anticipate that the next one would be more brutal. But, in addition and more persuasive on a finding that he was well aware of the nature of the assault, there is evidence that, when he interfered with the victim's escape, he held while his coaccused whipped. That alone is sufficient to make him a principal in the aggravated offense.

One other element must be considered. In this assault, the means ■■■■■ ■ of force employed was a belt with an unusually heavy buckle. The manner of use and

the area of the body toward which the attack was directed leaves no doubt that the means employed would be likely to produce grievous bodily harm. United States v Vigil, 3 USCMA 474, 13 CMR 30. However, we need go no further than to state that the law officer considered that the question was an issue to be decided by the court-martial. Accordingly, he submitted the issue to the fact finders under appropriate instructions, and they resolved it adversely to the accused.

### III

Left for consideration is the issue of the adequacy of the law officer's instructions upon the lesser included offense of assault and battery. To place that issue in its proper perspective, we should state that appellant complains because the law officer limited his instruction on simple assault to the use of a belt and buckle when, in fact, he should have permitted an alternate finding on the use of fists.

Appellant, in arguing his point, cites United States v Jackson, 6 USCMA 193, 19 CMR 319, as establishing the rule that an aider and abettor is "held to account according to the turpitude of his own motive." He contends the instruction in question was erroneous and prejudicial, as the law officer failed to place any limitations upon, or suggest any possible differentiation as to, the degree of Patterson's guilt in his instructions. Stated more concisely, he contends the law officer should have informed the court-martial that the two accused could be found guilty of different degrees of the offense.

In United States v Jackson, supra, the two participants were convicted of murder, on the principle that one had inflicted the fatal wounds with his knife, and the other had jointly participated in the homicide. We reversed as to Jackson, holding that he had raised an issue of involuntary manslaughter, on the theory that the use of a dangerous weapon might not have been fairly within the purview of their agreement to assault the victim. Furthermore, we held that, as a matter of law, the court-martial members were not compelled to regard the use of a dangerous weapon, under the circumstances of that case, as a natural and probable consequence of the common purpose. We expressed that holding as follows:

"Although we have determined that there is sufficient evidence to support the murder charge as to Jackson, it appears as a reasonable alternative that Jackson was willing to join Burns in an assault, but he did not contemplate or intend that either of them should use a knife. Murder requires an intent to kill or inflict grievous bodily harm. Since Burns used a knife it may be inferred that he possessed the required intent. But is the intent necessarily imputable to the accused? Article 77 of the Code, 50 USC § 671, does not compel such imputation. On the contrary, the court-martial might have found from the evidence that Jackson had no conscious knowledge Burns was carrying a weapon and that he would be inclined to use it. The court-martial, could, therefore, reasonably conclude that Jackson did not share Burns' criminal intent and that his guilt was no greater than that of manslaughter."

That holding, we believed, flowed naturally from the general rule concerning aiders and abettors, set forth in United States v Jacobs, supra, and expressed in 22 CJS, Criminal Law, § 87, in the following language:

"Where, however, two or more persons acting with a common intent jointly engage in the same undertaking and jointly commit an unlawful act, each is chargeable with liability and responsibility for the acts of all the others, each being guilty of the offense committed, to which he has contributed to the same extent as if he were the sole offender. The common purpose need not be to commit the particular crime which is committed; if two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other commits that par-

13

ticular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof. In order to show a community of unlawful purpose it is not necessary to show an express agreement or an understanding between the parties; nor is it necessary that the conspiracy or common purpose shall be shown by positive evidence . . . ."

When we turn to the facts of this case, however, it is at once apparent that United States v Jackson, supra, is readily distinguishable. In that instance, there was only one altercation, and it happened in a short period of time. The agreement had to be inferred from the acts of the parties; Burns, the actual killer, used a weapon belonging to him; the actual knifing took place out of Jackson's presence, and the court-martial could have found that Jackson did not realize his coaccused was armed. We held that the use of a knife might not have been a natural or probable consequence of the common purpose. Under those facts, there was a reasonable probability that the principal offender may have intended to kill or inflict serious bodily harm on the victim without the knowledge of Jackson. The latter, in ignorance of the purpose of the former, could have intended only a simple assault, and hence raised an issue concerning the degree of his guilt. Not so here, as the appellant and Gilbreath had a common objective to get the victim, and they carried it out rather effectively. In the first instance, they planned for, and jointly assaulted Basart in the Airmen's Club, during the course of which Gilbreath wielded a chair on him. After that incident had been terminated by their flight, they decided their task was unfinished, and, in order better to accomplish their purpose, they repaired to their barracks and changed into clothing suitable for their proposed venture. The victim was enticed to leave the club by Gilbreath, while the appellant remained in the near proximity. A second affray began outside, and when Gilbreath began to whip the victim about the head with the belt buckle and the latter attempted to flee, the appellant intervened and joined in the assault. Holding the victim while another applies the lash impresses us as being direct participation in an assault. Although there is no direct evidence touching on visibility at the time and place of this incident, the fight took place at the foot of the steps of the Airmen's Club, and one eyewitness was able to recognize the participants from a distance of fifty yards. It, therefore, may be concluded that the appellant could observe clearly all that went on. Aside from any question of active participation after knowing a dangerous weapon was being used, any prior agreement reached between the two accused clearly encompassed the means employed in this instance. Certainly there is no evidence that appellant understood the assault would not reach the aggravated stage, and the facts force an opposite conclusion. Under those conditions, there was and is no possibility that Patterson could be guilty of an offense lesser in degree than that found as to Gilbreath. Either the belt with the attached buckle was a dangerous weapon, and the findings are sustainable, or both accused were guilty of no more than assault and battery. We, therefore, conclude that the law officer's instructions were not erroneous, for there was no need specifically to point out that the two participants could be found guilty of different degrees of assault.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

Judge FERGUSON did not participate in the decision in this case.