UNITED STATES, Appellee

v

GAITHER L. BROWN, Specialist Third Class, U. S. Army, Appellant

7 USCMA 286, 22 CMR 76

No. 7917

Decided August 24, 1956

*Captain John F. Christensen* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley F. Flynn.*

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by general court-martial of assault with a dangerous weapon, a violation of Article 128, Uniform Code of Military Justice, 50 USC § 722. He was sentenced to a dishonorable discharge, total forfeitures, and confinement for one year.

The findings and sentence were approved by the convening authority except that portion providing for the punitive discharge which was suspended. An Army board of review affirmed the modified findings and sentence and we granted review to determine:

 1. Whether the evidence is sufficient to support the findings of guilty.
 2. Whether the instruction that the accused could be convicted on the theory of aiding or abetting, if the evidence warranted, was prejudicial.

A consideration of the first issue necessitates a rather thorough recitation of the facts. The victim, Johannes Kneer, a German National, testified that he was window-shopping on a street in Wurzburg, Germany, when accosted by three American soldiers. Two of the soldiers struck him. The blows opened a gash under his eye and cut his mouth. After the altercation, Kneer went home, secured the assistance of a friend, Mager, and proceeded back to the vicinity of the prior struggle with the avowed purpose of locating his assailants and turning them over to the police.

During the same evening the accused, Brown, along with McCall and Harper, were at a gasthaus in Germany known as "Mom's." Brown and McCall were attired in civilian clothes while Harper was in uniform. Rather late at night the soldiers departed the gasthaus for the Bahnhof, in order to board a bus back to camp. The accused had a sprained ankle and, rather than retard his companions' progress, hobbled several yards ahead of them. Close by a corner Kneer and Mager came upon the three soldiers. After bypassing Brown, Kneer recognized Harper as one of his earlier assailants. When Harper appeared to be raising his hands, Kneer struck him in the face. Harper ran back toward the gasthaus calling for assistance. At the appearance of considerable American reinforcements emerging from the gasthaus the Germans commenced running back in the direction of the accused. Kneer testified that on three separate occasions the accused attempted to stop him.

"So, I turned around and ran away, and the man that had been at the corner, that we had bypassed, stood still there, and he tried to stop me, but I could run around him and run away. And after about, I don't remember exactly, about twenty yards, he reached me and stopped me. I turned around to get away from him and then he went a few steps back, and I started running on, and after another few steps he had me again. So I turned around to fight him back and went on running, and then another twenty or thirty yards another man appeared on my right side, he wasn't this same one—I think it was the one who had hit me first—so he came on my right side, I turned around to face him, and the next moment the whole bunch of them was around me and the next moment I was on the ground and don't remember anything . . . ."

The victim added that he felt no pain at any time, nor did he recall that any of his assailants were armed with knives. He was finally able to work his way free of the group of soldiers; however, it was not until he arrived back home that he discovered he had been stabbed eleven times in the back. He was taken to the hospital in a serious condition. Kneer stated that after being thrown to the ground, he was aware that a crowd gathered, but he was unable to identify anyone.

Mager, Kneer's companion, testified that he witnessed a man in civilian clothes pounding on the victim's back. "One of them was close to the heels of my friend, . . . I turned around and I saw him laying on the ground, and I saw one who was in civilian clothes hitting him on the back." His impression was that the man striking Kneer on the back was wearing a blue-gray sweater. Other testimony indicated that the accused was wearing a black jacket over a sleeveless sweater.

According to McCall, who identified the victim as the "tall guy" and Mager as the "short guy," as he left the gasthaus, he was walking with Harper. Brown had preceded them eight or ten yards. As they rounded a corner, they met the Germans, and Kneer ran up to

Harper and struck him. Harper turned and started back up the street calling for help. Kneer kicked McCall, and then both Germans turned and retraced their steps to the corner where Brown was standing and commenced fighting with him. McCall testified that as he proceeded back to render Brown assistance, he extracted a knife from his pocket, opened it, and struck at Mager "once or twice." He thereafter chased Mager down the street. He broke off the chase and went over to where Harper and Kneer were on the ground fighting. He observed that Harper had "cut the tall guy, . . . and they were down there almost under the light, and so I started to jump on this guy and then I saw Harper had him." About that time Brown arrived on the scene, Harper let the German go, and Brown hit Kneer in the back with a weapon knocking him to the ground. McCall stated that Brown and the German "make contact again, so they gets down . . . so I saw Brown hit the guy a couple of times . . . with some sort of a weapon." In addition, McCall stated that Harper was standing beside him and should have seen the accused stab Kneer. After a brief interval, McCall went over to Brown and stated, "come on man we don't want to get in no more trouble than necessary and don't want to kill nobody." Brown then replied, "I guess you are right." Afterward at the Bahnhof the accused stated he had stabbed someone. The day following the incident, McCall was questioned by the Criminal Investigation Detachment. He admitted he had a knife, had struck at but missed Mager. He made no mention of the accused's complicity at the time because he didn't want to put the "finger" on a friend. Afterward he made a statement to his commanding officer about the accused's involvement in the offense. The Criminal Investigation Detachment was called and he repeated the statement.

Harper's account of the incident varied somewhat from that of McCall's. After the German knocked him down, he ran back toward the gasthaus for help. He tackled the German, but let him go because Kneer indicated that he did not want to fight. Next he turned and walked away without witnessing any difficulty between Brown and Kneer. In a few minutes, Brown and Harper walked up and sometime later Brown stated he had "stabbed a guy." Harper admitted on cross-examination that after the fight he had blood on the sleeve of his uniform and on his hands. Moreover he had been in other fights in the Service, and in the past had been known to carry a knife.

The accused testified in his own defense. He asserted that when the Germans repassed him at the corner, he exchanged a few blows with them. One of the Germans had something in his hands. Thereafter he saw Harper overtake the German and they scuffled in the dark, but by the time he arrived the German was back on his feet and leaving the area. After their first encounter, he never touched the victim. At the conclusion of the incident, McCall, Harper, and he, left by taxicab for their original destination, the Bahnhof. Although Harper had blood on his hands and so much on the sleeve of his uniform that it soaked through to his shirt, the accused testified that he was not aware that one of the Germans had been cut until the next afternoon when the Criminal Investigation Detachment informed him of that fact. After the incident neither he nor his companions discussed the fight. The accused also declared that he had not been down on the ground fighting with Kneer. However, while being questioned on redirect about who, besides Harper and McCall, was with him after the fight, he recalled noticing—while down on the ground— a soldier by the name of Holmes was also present.

"Q. Who is he?
A. He is the guy that rotated to the States this week.
Q. Was he in the crowd?
A. He came up *while I was down on the ground*." [Emphasis supplied.]

The case was poorly tried. No one questioned McCall further on the specific point respecting his testimony that Harper had cut the German. Moreover, it is plain from the record that there were other soldiers at the scene during

the altercation, yet apparently little effort was made to secure them as witnesses. The testimony of Harper was so fraught with inconsistencies that one member of the court was moved to remark: "I would like to ask the law officer is a lie detector permissible in a general court-martial? . . . It is quite obvious we have got several different kinds of testimony here today." But be that as it may, the prosecution presented direct testimony by eyewitness McCall that the accused stabbed Kneer in the back. Moreover, both McCall and Harper testified that the accused, while at the Bahnhof, volunteered the statement that he had stabbed someone. Mager also testified that he saw someone in civilian clothes pounding Kneer on the back. Although the accused denied both the assault and the statement, the credibility of the witnesses was a matter for the trial court's determination. United States v Armstrong, 4 USCMA 248, 15 CMR 248; United States v Taylor, 5 USCMA 775, 19 CMR 71.

The accused argues that the discrepancies in the testimony of McCall and Harper were so flagrant that they compel us to reject—as a matter of law— their testimony. We do not agree with this conclusion. McCall explained that his prior statements, which failed to implicate the accused, were predicated upon his reluctance to "finger" a friend. Also it must be remembered that Mager witnessed a man in civilian clothes striking the victim in the back. And the fact that Harper had blood on his uniform is not inconsistent with the accused's guilt. Harper could have received the blood from earlier wounds received by the victim, or Kneer could have been wounded during his first encounter with Brown. In addition, it is probable that all three soldiers were using knives. The fact that two of the culprits were granted immunity in order to convict the third does not relieve the accused of guilt. United States v Taylor, supra. McCall admitted drawing a knife. Besides admitting that he had stabbed someone, the accused was seen striking the victim in

**290**

the back with a weapon and McCall testified that Harper also cut the victim. All these facts, plus Brown's judicial admission that he was "down on the ground" are certainly sufficient evidence to support the findings. We are not fact finders and because the testimony on both sides is in some respects inconsistent and contradictory does not compel its rejection by this Court. This problem was adequately disposed of by the Court in United States v Doctor, 7 USCMA 126, 21 CMR 252:

". . . [W]e believe it advisable to restate certain principles of law governing the province of the court-martial and the board of review, and our power to review their findings. Both of those military bodies were delegated fact-finding powers, but in granting powers to this Court, Congress limited us to matters of law. Without getting into an academic dissertation on an appellate court's power to weigh facts for insufficiency as a matter of law—a question which is considered in each subsequent section —we call attention to the following principles which have been previously adopted by us. The court-martial in the first instance has the duty of determining the credibility of the witness; the weight and sufficiency of the evidence; reasonable doubt as to guilt; the inferences to be drawn from the proven facts; the interest or bias of witnesses; and, in the final analysis, where the truth lies." The board of review has somewhat comparable powers, but it is admonished by the Code to give consideration to the fact that the court-martial saw and heard the witnesses. Accordingly, its powers are not quite so broad as the trial forum. However, when the case reaches us, we merely measure the evidence to the extent of determining whether it is sufficient as a matter of law to support the findings."

We pass on now to a consideration of whether the law officer's instruction that the accused could be convicted on the theory of aiding and abetting was prejudicial. Article 77 of the Code, 50 USC § 671, renders liable as a principal an accused who "commits an offense

punishable by the code, or aids, abets, counsels, commands, or procures its commission." Although the law of aider and abettor looks toward an association of the accused in the venture, there need be no express agreement between the parties to assault the victim. This is made clear by 22 CJS Criminal Law, § 87, which recites the following general rule:

"Where, however, two or more persons acting with a common intent jointly engage in the same undertaking and jointly commit an unlawful act, each is chargeable with liability and responsibility for the acts of all the others, each being guilty of the offense committed, to which he has contributed to the same extent as if he were the sole offender. The common purpose need not be to commit the particular crime which is committed; if two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other commits that particular crime, *but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof. .In order to show a community of unlawful purpose it is not necessary to show an express agreement or an understanding between the parties; nor is it necessary that the conspiracy or common purpose shall be shown by positive evidence. . . ."* [Emphasis supplied.]

In United States v Patterson, 7 US CMA 9, 21 CMR 135, the Court was confronted with a situation where—as here—the accused prevented the escape of the victim. In that case the accused was convicted of assault with a dangerous weapon. The evidence indicates that the accused and one Gilbreath jointly assaulted the victim in an airmen's club in the course of which Gilbreath hit the victim with a chair. The accused and Gilbreath then left the club and a witness overheard one of them remark that he was going to "get" the victim. Both proceeded to their barracks and changed clothes. They re-turned to the club and Gilbreath asked the victim to come outside and fight. The latter accepted, and after a brief exchange Gilbreath took off his belt, which contained a heavy buckle, wrapped the belt around his hand and commenced to flail the victim about the head. When the victim attempted to retreat into the club, the accused blocked the entrance and held him while Gilbreath administered a further beating. The accused argued that he could not be an aider and abettor to the aggravated assault with the belt since the only preparation made was a clothing change, and had they intended to assault Basart with something other than their fists, they would have come armed with a weapon. The Court rejected this argument stating:

"Throughout the period between the two offenses, appellant was in constant company with Gilbreath. His apparent willingness to join in further beatings of the victim, coupled with such acts as changing to more appropriate fighting togs and returning to seek out Basart, would encourage Gilbreath to believe that he would have a ready ally. Every act of the accused during that period was calculated to further the venture of getting the victim. His appearance in the doorway of the club in time to stop Basart's retreat seems to have been more than a mere happenstance. It is reasonable to infer in light of his previous preparation for a fight that he was watching and waiting in a strategic spot for the moment when his active participation would be required and have the most devastating effect. *Regardless of his counsel's protests to the contrary, he actively assisted in inflicting the injuries on the victim by blocking entry into a place of relative safety, and by holding Basart while Gilbreath continued his assault with his teeth.* Even when we interpret the evidence in a manner most favorable to the appellant, we are still forced to conclude that it would test the credulity of any reasonable man to find he did not knowingly and willingly join in the aggravated assault. In so concluding, we have not overlooked his contention

that he could not foretell that an aggravated assault would ensue. He had participated in one assault which might fairly have been alleged as being of that character and heinousness, and he could reasonably anticipate that the next one would be more brutal. But, in addition and more persuasive on a finding that he was well aware of the nature of the assault, there is evidence that, *when he interfered with the victim's escape, he held while his coaccused whipped. That alone is sufficient to make him a principal in the aggravated offense."* [Emphasis supplied.]

Another aider and abettor problem was before us in United States v Jacobs, 1 USCMA 209, 2 CMR 115. The accused and three other soldiers entered a private dwelling in Tokyo, assaulted the owner, and took his purse which contained 900 yen. The owner's brother, who came to the latter's aid during the assault, testified that the accused stood aside while the other soldiers administered the beating. The owner of the house, however, testified that all four soldiers participated in the assault. The assailants were apprehended and the purse was found in the possession of one of the other soldiers. The Court held the evidence supported the court's conclusion that the accused participated in the robbery as an aider and abettor. The Court held:

". . . To relieve one who shares a common purpose to commit a felony, and actually assists in its perpetration, from the penalty exacted by society therefor, merely because his assigned role in the total scheme does not encompass action as to all elements of the offense, is contrary to both reason and justice.

". . . The evidence before the court-martial renders improbable an inference that petitioner personally committed the robbery alleged, although it amply supports a finding that he engaged in the attack on Hatsuo Takata. This assault provides the necessary act of assistance, and accordingly we have before us much more than mere presence at the scene of the crime. The element of

intent remains. Circumstantial evidence may be relied on to establish that one who committed an act in furtherance of a crime, in fact shared a common purpose to accomplish the resulting felony."

Under the facts of the instant case, the offense of aiding and abetting was reasonably raised by the evidence. After the initial encounter with Harper, when the Germans observed the approach of additional American support, they attempted to withdraw from the scene of conflict. According to Kneer, however, Brown attempted to stop him on three separate occasions, and each time blows were exchanged. The accused admitted one altercation with the Germans, and he also testified that not only was one of the Germans armed with a weapon but succeeded in cutting his trousers. When McCall came to Brown's assistance, he had already taken his knife from his pocket and opened the blade. Moreover, McCall immediately struck at one of the Germans with the weapon and he eventually chased his adversary down the street with the knife in his hand. Harper was a member of the accused's company, and Brown testified that he was a friend. According to his commanding officer and other individuals acquainted with him, Harper had a bad reputation. Harper, himself, admitted he was a knife-carrier. These facts about Harper were common knowledge. Surely the accused was not totally ignorant of them. If we proceed on the theory that the accused did not actually cut the victim, then Harper must have performed the deed. If Harper was the guilty party when he passed by Brown during his chase of Kneer, it is probable that he also had out his knife. The record discloses that in the space of a minute or two, Kneer's back was cut to ribbons. He received vicious knife wounds, some penetrating to a depth of three or four inches. At the hospital, it was disclosed that both lungs had been collapsed. Necessarily Brown, aware that this was a knife fight, by attempting to stop the Germans, turning and pursuing them, and upon arriving at the scene, getting "right into it

again," actively participated in the aggravated assault. This is so even though he did not actually wield the knife. United States v Patterson, supra.

Finally, as previously pointed out, the court would have been justified in believing that Harper as well as Brown cut Kneer. McCall unequivocally testified that besides Brown, Harper cut the German. After the fight, Harper's sleeve was drenched with blood. The court was not compelled to believe that Harper, or the accused, individually did the actual stabbing. Under these facts the law officer's instruction posed no irreconcilable conflicts prejudicial to the rights of the accused.

Accordingly, the decision of the board of review is affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the evidence fails to show sufficient circumstances to justify the law officer's instructions on aiding and abetting. If the prosecution's own witnesses, McCall and Harper, are to be believed at all, the fight was over when the accused purportedly approached and stabbed the victim. Although McCall testified that he saw Harper either let Kneer go, or Kneer got away by himself, Harper testified that he "let him go," because he had "indicate[d] that he didn't want to fight or anything." Harper claims that he then walked away. On the other hand, McCall maintains that Harper stood "almost beside him" for a "couple of minutes" while the accused fought with Kneer. The discrepancy as such is unimportant.

The significant fact is that the testimony of both witnesses shows that the struggle was ended before the accused came on the scene. Thus, McCall testified that when Kneer got up from the ground, the accused was still a "good ways behind." Harper asserted that he noticed Brown when Brown walked up "after I had let the German up"; the first thing that Brown did when he approached was to ask questions. He "wanted to know who started it, and why he started it." Consequently, there is no basis whatever for application of the principle of aiding and abetting to the facts of this case. Under the law officer's instructions, therefore, the court-martial was permitted to speculate on a theory that was not reasonably raised.

In any event, assuming that the question of the continuance of the fight was one of fact for the court members' consideration, the law officer failed to mention that matter in connection with his instructions on aiding and abetting. In view of the contradictions and conflicts in the prosecution's case, the failure to instruct properly prejudiced the accused. I would, therefore, set aside the findings of guilty and the sentence, and order a rehearing.