UNITED STATES, Appellee

v

WARREN A. ALBRIGHT, Private E–2, U. S. Army, Appellant

9 USCMA 628, 26 CMR 408

No. 10,495

Decided September 26, 1958

*Captain Arnold I. Melnick* argued the cause for Appellant, Accused. With him on the brief was *Colonel Edward M. O'Connell.*

*First Lieutenant Thomas M. Lofton* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel John G. Lee.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was charged and convicted by a court-martial for rape and sodomy, in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920, and Article 125, Uniform Code of Military Justice, 10 USC § 925, respectively. He was sentenced to dishonorable discharge, total forfeitures, and confinement for the term of his natural life.

The convening authority affirmed the sentence. The board of review modified the term of confinement to twenty-five years but otherwise approved the remainder of the sentence.

The defense requested review of six issues upon an open grant of which the first is one of factual sufficiency.

The accused in the company of three soldiers terminated their evening's liberty on July 8, 1956, with forced carnal copulation and sodomy on a young farm girl.

The victim testified as follows: During the evening of July 8, 1956, she was cycling to her home in the village of Alletsried from Roetz, Germany. She was traveling alone and upon coming to an incline in the road too steep for pedaling, got off her bicycle prior to passing four soldiers. After passing the soldiers, they called to her but she refrained from replying. The soldiers ran after her, took the bicycle from her and forcibly carried her into an adjoining oat field in spite of her protests and screams. She was violated sexually by each of the four soldiers. Upon the completion of these acts they returned with the victim to the road. After walking a short distance she was again taken into the woods, thrown to the ground and violated again by two of the soldiers simultaneously, one having sexual intercourse and the other committing an act of anal sodomy upon her. The two remaining soldiers did not participate in this act. They again led the victim from the woods and walked with her a distance. She managed to loosen a restricting wristhold and to flag a motorcyclist coming from the direction of Roetz, whereupon the soldiers released her and she was allowed to accompany the motorcyclist to the summit of the hill. She proceeded alone from there to her home.

The defense admitted the fact of rape and sodomy but denied the accused's complicity in it. The accused entered a plea of not guilty to the crime. He chose to testify and related his activities of the evening in question. His testimony revealed he left the border camp around 6:30 in the evening in the company of Cates, Costa, and Clinton. They stopped at a shop for gin and visited a place called "The House of Five Sisters." While walking back to camp, a girl approached them on a bicycle. The accused alleged Costa hailed the girl and engaged her in conversation. The accused related then that he discovered the loss of his duffel bag keys and told the group he was going back toward the town of Roetz to look for them. He walked toward the bridge located on the road. There, he began looking for his keys at the same point where he thought they had dropped from his pocket. He found his keys and double-timed back to catch

630

up with his companions. They were waiting at the border camp gate. He affirmatively stated he did not participate in the rape or sodomy.

The prosecution relied for conviction upon the testimony of the prosecution's witness, Cates, one of the co-conspirators who had been convicted in an earlier trial. Cates testified that not only had the accused been a participant but an instigator, that he had been the one who had captured the victim. He stated it was the accused who had suggested the act be repeated, and that he, Cates, had had intercourse with the girl a second time while the accused had performed the act of sodomy upon her.

The prosecution also called a Frau Dambrowsky as a witness, who testified that she was returning to her home after attending the movies and had passed the girl on her bicycle and shortly thereafter had heard a scream. She also testified to the fact that she had passed no one else on the road. The accused testified he passed no one on the road when he sought his lost keys. Karl Hahn, a German barber for Company D, testified that the accused during the investigation had asked him to negotiate a money settlement with the victim's parents. He stated that the accused at that time had professed his innocence.

The defense relies upon appeal on the doubtful identification of the accused by the victim. She testified on the stand that the accused was one of the four attackers. However, the defense pointed out that the victim, from a police line-up of eight, had identified three who had victimized her but had failed to pick the accused from the line-up. Additionally, it was brought out that it was only after a German police officer had indicated to her that the accused was one of them did she become certain of his identity. While testifying on the stand, the victim stated she lost consciousness during the two periods of her attack, but positively identified the accused as one of the men.

The defense urges the lack of credibility of the main prosecution's witness, Cates, a convicted rapist, and that therefore his testimony lacked credence as a matter of law to support the accused's conviction. Another plea was that the witness, Cates, had on July 10, 1956, two days after the incident, signed a statement relieving the accused of any responsibility for the crimes. However, he recanted the truthfulness of the prior statement while on the stand. He stated it had been agreed among the four that if anyone was caught he would not involve the others.

We do not agree with the defense that the prosecution's evidence was insufficient to sustain the findings of guilt as a matter of law. The members heard the testimony of the witnesses, observed the personal demeanor of each witness, and were in a superior position to judge the credibility of their testimony and to accept or reject it according to their judgment as to its truthfulness. In the absence of any evidence that the accused's conviction rests upon a showing of insufficiency as a matter of law, the findings of the court will remain undisturbed. We have long adhered to the judicial principle of appellate review that it is not our proper function to reweigh the credibility of a witness and to determine independently the credence to be afforded the testimony of each witness. United States v Taylor, 5 USCMA 775, 19 CMR 71. It is apparent the court members chose to believe the witness, Cates, when he implicated the accused in the acts. It was additionally argued that some pressure was exercised against Cates in the form of a promise of a lighter sentence in return for his testimony against the accused. We have no doubt such a promise would influence a prospective witness to speak out, but that is not to say the testimony of the witness would completely lack truthfulness as a matter of law. United States v Taylor, supra. This information was placed before the court and was part of the evidence to be taken into consideration by it in judging his credibility. The court chose to believe the account of the evening given by the prosecution's witnesses and it therefore found

adversely to the accused. We will not disturb that finding.

The following two assigned errors allege that the interpreter utilized at the trial was not sworn prior to his translation of the testimony of the witness, and that the board of review erred in rejecting the accused's affidavits pertaining to the accuracy of the record of trial.

Necessitating an interpreter were those witnesses relied upon by the prosecution for the most part, including the complaining party, who were German nationals unfamiliar with the English language.

Article 42 of the Uniform Code of Military Justice, 10 USC § 842, sets out the legal requirements of the officers who must take the oath before assuming their duties and functions in a court-martial. The Article reads in part as follows:

"(a) The law officer, interpreters, and, in general and special courts-martial, members, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, and reporters shall take an oath in the presence of the accused to perform their duties faithfully."

Defense challenges the authentic quality of the record in that it reflects the fact that the interpreter was sworn when, in fact, he was not so sworn. This contention is supported by way of affidavits of defense counsel, the contents of which reflect a statement that to their personal knowledge the interpreter was not sworn, further submitting in substantiation a note jotted down during the course of the trial by defense counsel to the effect that the interpreter had not been duly sworn. It is strongly urged that the board should have sent the record back to the convening authority for a hearing on this issue. We find insufficient merit in the argument to warrant further consideration of this alleged error. In United States v Galloway, 2 USCMA 433, 9 CMR 63, we emphasized our adherence to the well-settled doctrine that,

"... The great weight of authority in the United States holds that the records and judgments of the trial court import absolute verity and may not, in the absence of a charge of fraud, be challenged. Edminston v Hunter, 161 F 2d 691, 692 (CA 10th Cir); Thomas v Hunter, 153 F 2d 834, 838 (CA10th Cir); Smith v Hiatt, 54 F Supp 481, 483; 31 C.J.S. Evidence § 145, page 792, et seq."

See also United States v Walters, 4 USCMA 617, 16 CMR 191. In the absence of any allegation of fraud, we find no supportable theory upon which additional inquiry would be justified. The record of trial shows clearly that the interpreter was sworn and we accept it as an accurate recordation of the occurrence at the trial.

The next assigned error concerns an alleged error in the instructions. Examination of the record leaves no doubt the accused had the benefit of full and appropriate instructions. We find no error.

Turning now to the fifth error urged, regarding the post-trial review, it is alleged that the staff judge advocate assumed the role of prosecutor in the instant case. It is argued that through the actions of the staff judge advocate prior to trial he became associated with the prosecution and, as a consequence, the accused was deprived of an impartial post-trial review. Through the testimony of the prosecution's witness, Cates, it was brought out on cross-examination by defense that Cates had been promised a reduction in sentence if he would agree to testify against the accused. It was additionally revealed that the staff judge advocate negotiated this agreement with the witness and that the witness received a personal assurance from the staff judge advocate he would recommend a sentence reduction. This same staff judge advocate reviewed the accused's conviction in accordance with the direction for review set out in Article 61, Uniform Code of Military Justice, 10 USC § 861.[1]

Article 6 of the Uniform Code of

[1] "Art. 61. Same—General court-martial records

Military Justice, 10 USC § 806, sets out certain functions and duties of judge advocates and legal officers. Subsection (c) states:

> "No person who has acted as member, law officer, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case may later act as a staff judge advocate or legal officer to any reviewing authority *upon the same case*." [Emphasis supplied.]

In United States v Hightower, 5 USCMA 385, 18 CMR 9, we reviewed the application of this subsection. In arriving at a decision, we resorted to a comparison of a similarly phrased prohibition in Article 27(a) of the Code, supra, 10 USC § 827.[2] We stated that: "Each of these articles of the Uniform Code prohibits persons who act in one capacity 'in any case' from thereafter performing duties in an inconsistent capacity in 'the same case.' The plain purpose of these provisions is to preclude situations which impair or destroy the fairness and impartiality of the proceedings against the accused." The error there rested upon the facts that revealed the accused at a former trial had had for his witness an individual who testified on his behalf. Later the individual was tried for perjury and contemporaneously charges were filed against the accused for having suborned his witness and for falsely testifying himself. The trial counsel who prosecuted the witness was appointed trial counsel (although he did not serve as such) in the prosecution of the accused, and then he subsequently conducted accused's post-trial review

and prepared the formal staff judge advocate's review. We held that "such duality of function constitutes prejudicial error."

Those considerations prevail here. An affiliation of advocacy of an officer of a court whose function must carry with it a high degree of impartiality and fairness does not go hand in hand with the concept of military due process. The fact that the staff judge advocate here was instrumental in prevailing upon the witness, Cates, to testify against the accused leaves no doubt that his action had the earmarks of advocacy and zealous prosecution. He was precluded from rendering an unbiased and unimpassioned review as required by the Code. We hold, therefore, that the staff judge advocate was disqualified to review the record of the trial of the accused. As we said in United States v Renton, 8 USCMA 697, 25 CMR 201, "the very fact of being called upon to condemn or countenance one's own workmanship cannot create a healthy outcome and less so when the outcome concerns the accused's denial of substantial rights."

In accordance with the views expressed we do not find it necessary to discuss the final issue. Insofar as the decision of the board of review is contra to the views herein expressed, the decision of the board of review is reversed. The record is herewith returned to The Judge Advocate General of the Army for a new review by a different staff judge advocate.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

---

"The convening authority shall refer the record of each general court-martial to his staff judge advocate or legal officer, who shall submit his written opinion thereon to the convening authority. If the final action of the court has resulted in an acquittal of all charges and specifications, the opinion shall be limited to questions of jurisdiction and shall be forwarded with the record to the Judge Advocate General of the armed force of which the accused is a member."

[2] "For each general and special court-martial the authority convening

the court shall detail trial counsel and defense counsel, and such assistants as he considers appropriate. No person who has acted as investigating officer, law officer, or court member in any case may act later as trial counsel, assistant trial counsel, or, unless expressly requested by the accused, as defense counsel or assistant defense counsel in the same case. No person who has acted for the prosecution may act later in the same case for the defense, nor may any person who has acted for the defense act later in the same case for the prosecution."

I concur in the opinion excepting that portion which holds that a new review is required and from that I dissent.

I believe the Court errs grievously when it fails to give due consideration to the varied duties and responsibilities of a staff judge advocate and his capacity to perform what on the surface appear to be conflicting obligations. By law and by regulation, he is cast in a role which requires military, judicial, and administrative functions and to hold the performance of one type of work bars him from performing another is to destroy the effectiveness of the office. In connection with his military duties, he is advisor to his commanding officer on legal matters, including those dealing with military justice. Article 6(b) of the Uniform Code of Military Justice, 10 USC § 806, directs that convening authorities shall at all times communicate directly with their staff judge advocates or legal officers in matters relating to the administration of military justice. Conversely, a staff judge advocate has only the authority to act for or on behalf of the commander, and he must consult with him and obtain his approval before any action can be taken on those duties belonging to the commander which cannot be delegated. In this sphere of activity, there is a relationship between the two which requires some degree of partisanship for, whether we like it or not, in this capacity the lawyer cannot sit on the fence. He must take a position on one side of the question.

As to his administrative functions, he is chief spokesman for the commanding officer on all legal matters, and it is his duty to supervise the administration of justice within the command. When he wears that hat, he must see that military justice is properly and expeditiously rendered and that it is not miscarried against either the accused or the Government. He must make certain that both trial and defense counsel perform their duties in an appropriate manner and advise and consult with them on particular cases. There are many procedural and substantive law questions which he may be required to discuss with them before seeking a decision from his superior. He must keep informed of the status of cases, and he must proceed on his own initiative to institute reforms that will improve the administration of justice within the command. Finally, he is the legal conduit between the commander and other officers and men of the organization.

A staff judge advocate wears his judicial robes when he reviews charges before trial by general court-martial, reviews records of general courts-martial after trial, reviews records of special courts-martial involving bad-conduct discharges, and examines records of trial by special and summary courts-martial.

I have not intended to list all of the numerous duties of a staff judge advocate, but I have mentioned sufficient to show that he must be able to combine the talents of an advisor with the accomplishments of a judge. His advice, counsel, and recommendations may be necessary on many matters collateral to the guilt or innocence of an accused awaiting or on trial, and yet he must review the final product. Accordingly, he must be mentally disciplined and equipped not to permit his preliminary conclusions to distort his judgment on final review, and I am not willing to find he cannot make the adjustment. The necessity for having to do so can be well illustrated by the codal requirements themselves. Article 34 of the Code, 10 USC § 834, requires that, before directing a trial by general court-martial, the convening authority must refer the record to his legal advisor for consideration and advice. Cast in that role, the staff judge advocate must form an opinion on the weight and reliability of the evidence, and he must advise his commander on the desirability of ordering the case to be tried on the merits. Before doing that, he must obviously form some opinion about the weight of the evidence, the credibility of the probable witnesses, and the possibility that the Government will establish a prima facie case of guilt. Congress apparently did not believe that that much prior participation would warp his

634

judgment on final review, for it went on to direct that he review the record after trial. In fact, by so doing, I believe it fair to say Congress paid a definite accolade to those who were serving in that office, and expressly recognized their ability to remain dispassionate and objective. And I point out that the current enactments reaffirm the well-recognized and long-standing practice under prior applicable statutes. Moreover, we have reached similar conclusions in other areas. In United States v Haimson, 5 USCMA 208, 17 CMR 208, we held that some prior participation by a staff judge advocate in assisting trial counsel in preparing a case properly is not disqualifying, and we even suggested that he might aid both parties. Furthermore, in United States v De Angelis, 3 USCMA 298, 12 CMR 54, we rejected a contention that a staff judge advocate was disqualified to review a record of trial for the reason that he furnished advice to a pretrial investigating officer. In that instance, we announced a principle—perhaps overlooked in the case at bar—that a staff judge advocate has some responsibility for the administration of military justice within the command and noted it would be incongruous were he to be immobilized until he finally acted on the record.

At this late date and with many seemingly conflicting duties placed on his shoulders by law and regulations, it seems to me to be paradoxical for us to hold that he forfeits his right to wear his judicial robe merely because he has previously worn the gown of an advisor. Certainly, it remains for us to deal practically with the peculiarities of the military service and to cut our coat from the cloth furnished by Congress. It is my belief that in this instance we fail to do just that.

Before relating the testimony I find in this record, I believe it advisable to further develop my concept on one facet of the staff judge advocate assignment. One of the principal purposes of detailing a lawyer to serve on the staff of a senior commander is to take off the latter's shoulders the myriad of details encountered in administering military justice. A commander must be burdened with the incidents of battle, but he should not be bothered with all the infinite problems incident to the trial of criminal cases. His clearing house for that purpose is the office of the staff judge advocate and, if the latter cannot be consulted for preliminary advice, recommendations, or assistance without being disqualified from performing his other statutory duties, then I say the commanding officer is the only person to whom anyone may go. That solution merely complicates the problem for, if that comes about, then there will be a well-beaten path to the commander's office by those who seek information, advice, or help, and he then may find himself in the disqualified class because once he acts on a preliminary question, he will be charged with failing to give the finalized record an impartial review. In this particular instance, if the staff judge advocate is disqualified because he agreed to recommend some reduction in the sentence, I see no escape from a holding that the convening authority comes within the incapacitation, for he approved the recommendation. I am certain he knew the reason for the requested clemency and, under the rationale of this case, he could not approve the recommendation unless he accepted the fact that the witness would tell the truth. The end result of that line of reasoning is that clemency canot be extended to those who offer to aid the Government in its prosecution of crime.

That brings me to the facts of this case. My associates say the staff judge advocate's actions had the earmarks of advocacy and zealous prosecution. I fail to see those markings, and I quote the record as it pertains to this problem:

"CROSS EXAMINATION

"Questions by the Individual Defense Counsel:

"Q. Cates, what have you been promised to come in here and testify against Albright?

"A. What have I been promised?

"Q. Yes; did anybody say that they would do something for you?

**635**

"A. I cannot say that I have been promised anything.

"Q. Have they not promised you that they would reduce your sentence to twenty-five years?

"A. I cannot say that they promised to reduce my sentence to twenty-five years, because they have not promised me.

"Q. You know that you are under oath, do you not?

"A. I know I am under oath.

. . . . .

"Q. Has anybody told you at all that they would recommend reducing your sentence to twenty-five years if you came in and testified?

"A. Yes, I have been told that they would recommend that.

"Q. Who told you that?

"A. Who told me that?

"Q. Yes.

"A. Well, I was told that the general would.

"Q. What was that?

"A. I was told that the general would.

"Q. You were told that the general would do that; who told you that?

"A. Captain Flake [the trial counsel].

"Q. Captain Falke [sic] told you that? Did anybody else tell you that?

"A. The Judge Advocate.

"Q. Who is that?

"A. I do not know his name.

"Q. Was that in Stuttgart?

"A. With the 7th Headquarters.

"Q. Is he a full colonel?

"A. That is right.

"Q. And he called you in?

"A. Yes, he called me in.

"Q. Was it Colonel Urquhart [the staff judge advocate]?

"A. I do not know.

"Q. And were you present before him?

"A. Yes, sir.

"Q. And he said that he would recommend twenty-five years if you came in and testified against Albright?

"A. Well, he did not tell me that he would recommend me twenty-five years if I just testify.

"Q. So they said that they would recommend a little less?

"A. He said he would recommend a little less.

"Q. What do you expect?

"A. Well, I do expect that he would recommend that, I do expect so.

"Q. You do expect some lowering of the sentence?

"A. I do.

"Q. You expect a little lower then twenty-five years, do you not?

"A. I do not know if it would be more than twenty-five years.

"Q. Did you not tell me when you talked to me that you would not testify unless he promised that?

"A. No, sir.

"Q. You did not say that to me this morning?

"A. No, I did not.

"Q. Did they promise to punish you or not lower your sentence if you did not testify?

"A. They did not promise to punish me in no way."

All I find in that testimony is that trial counsel had consulted with the witness about testifying for the Government if some leniency were to be recommended in his behalf. I have every reason to believe that this discussion was with the concurrence of the witness's legal counsel, and that is an acceptable practice in most American jurisdictions. The matter was then discussed with the staff judge advocate who, after talking with the witness to verify his willingness, agreed to make a recommendation to the convening authority that some leniency be extended for the assistance. If that much participation is diqualifying, then I pose this question: To whom in the military service does trial counsel go to discuss the question of obtaining the authority to offer leniency for the testimony of a prospective witness? If the answer is, to the convening authority, then I sense a holding that he cannot act on the final review.

I would affirm the decision of the board of review.