474

UNITED STATES, Appellee,

v.

Richard A. NEWMAN, Jr., Private First
Class, U.S. Army, Appellant.

No. 41498.
CM 440013.

U. S. Court of Military Appeals.

Jan. 31, 1983.

For Appellant: *Captain Donna Chapin
Maizel* (argued); *Major Raymond C. Rup-
pert, Captain Joseph A. Russelburg, Cap-
tain Gunther O. Carrle* (on brief); *Colonel
William G. Eckhardt.*

For Appellee: *Captain Paul E. Jordan* (argued); *Colonel R.R. Boller, Major John T. Edwards, Captain Paul K. Cascio, Captain Michael E. Pfau* (on brief); *Major John T. Meixell.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Mainz-Gonsenheim, Germany, by a general court-martial composed of officers. Charge I alleged that he conspired with Private First Class Kasimer W. Rutherford and Bettina Grupe to wrongfully use heroin, in violation of Article 81 of the Uniform Code of Military Justice, 10 U.S.C. § 881. According to Charge II, appellant, in conjunction with Rutherford and Grupe, violated a general regulation by wrongfully possessing a hypodermic syringe needle, contrary to Article 92 of the Code, 10 U.S.C. § 892. Charge III, which was predicated on Article 134, UCMJ, 10 U.S.C. § 934, consisted of two specifications: The first alleged wrongful possession of .40 grams of hashish and the second asserted that, in conjunction with Rutherford and Grupe, appellant wrongfully possessed .10 grams of heroin. Contrary to his pleas, Newman was convicted of every specification and charge and was sentenced to dishonorable discharge, confinement at hard labor for 2 years, total forfeitures, and reduction to the lowest enlisted grade.

The convening authority disapproved the findings of guilty as to the conspiracy charge[1] and approved only a bad-conduct discharge, confinement at hard labor for 18 months, total forfeitures, and reduction. After the approved findings of guilty and the sentence had been affirmed by the Court of Military Review (Judge O'Donnell, concurring in part and dissenting in part), we granted review on these issues:

I

WHETHER THE MILITARY JUDGE ERRED IN HIS INSTRUCTION TO THE COURT MEMBERS TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY INSTRUCTING THE COURT MEMBERS THAT THEY COULD FIND THE APPELLANT GUILTY EVEN IF THEY DID NOT FIND THAT HE KNOWINGLY POSSESSED CONTRABAND BUT THEY DID FIND THAT HIS LACK OF KNOWLEDGE RESULTED FROM APPELLANT'S DELIBERATE AVOIDANCE OF KNOWLEDGE.

II

WAS THE CONVENING AUTHORITY DISQUALIFIED FROM ACTING ON THE CASE ON THE GROUNDS THAT HE HAD GRANTED IMMUNITY TO A DEFENSE WITNESS?

I

Herr Hans-Werner Jacob testified that he had been a German police officer for many years and that at about 10:00 p.m. on the evening of November 7, 1979 he had seen appellant's car parked on a parking deck near the Gypsy Bar discotheque. "Newman was the driver. Bettina Grupe was the passenger" and Private Rutherford was in the rear. Fraulein Grupe, who was "well known to" Herr Jacob by reason of his many years of experience with drug cases in Mainz, "was a little bent over with her upper body. She was doing, assumingly something at the glove compartment. She looked then to the right. At that moment I had opened the passenger's door of Newman's car." The glove compartment was open; there Jacob found the "tab of a cola . . . or lemonade can, and several small paper envelopes." On the floor on the passenger side were "two teaspoons, and a filled plastic syringe"; and "there was a pipe on the rear seat." From his experience with heroin, Jacob believed that the paper envelopes contained heroin.

1. This finding was disapproved because "[n]o evidence was adduced to show that the overt act alleged, the accused's parking of his car, was done to effect the object of the conspiracy."

Herr Rainer Buchholz, another German policeman, testified that he had been present with Herr Jacob and had searched an American field jacket which also was found in the rear seat of the car. "On the right side [of the jacket] ... were two small bottles with medicine. And, in the left outer ... pocket was a piece of tinfoil," which contained a small amount of hashish. "Furthermore, there was in his left pocket a piece of tinfoil and paper which you use in order to prepare cigarettes yourself."

Appellant and Rutherford had been released to Sergeant Steven P. Buttrick, an American military policeman. He testified that, with Newman's consent, he had searched his car and found a hypodermic needle in the glove compartment and three packets of heroin over the top of the sun visor on the passenger's side. Buttrick and his partner, Specialist Overton, also searched Newman but found no drugs or needles.

Sergeant Jack Kampa of the Drug Suppression Team in Mainz, described how he had received from the military police and from the German police various items of evidence which he had later turned over to the evidence custodian at the Mainz Office of the Criminal Investigation Division (CID). Establishing another link in the chain of custody of various exhibits, Special Agent Wolfgang Larsen testified that he was evidence custodian for the Mainz CID Detachment and in this connection he had received evidence from Kampa which he had sent by registered mail to the CID Frankfurt Crime Laboratory. A forensic chemist from that laboratory then explained to the court members the conclusions reached through his laboratory analysis of the various items of evidence. According to him, the foil packet seized by the Germans contained marihuana in the hashish form; the smoking device contained burnt marihuana residue; one of the spoons had a trace amount of heroin; and the three foil packets contained heroin.

As its first witness, the defense recalled Sergeant Kampa, who testified that he had observed that Rutherford "appeared to be intoxicated." While there was no odor of alcohol, Rutherford "[h]ad constricted pupils ... was very drowsy [and] ... was dozing off on several occasions. I also noticed numerous needle marks on his forearms." From his "experience" with drug cases, Kampa concluded that Rutherford "was intoxicated on a narcotic." On the other hand, appellant had not appeared to be under the influence of a drug and Kampa did not "notice any marks on his arms."

When Rutherford was called by the defense as its next witness, he declined to testify and was excused for the moment. Thereupon Captain Ostrand, appellant's company commander, testified that appellant was "very intelligent" but also "very immature," and had "exhibited a lack of common sense." Apparently this testimony was adduced to support a defense theory that appellant had not been using narcotics himself but, because of his lack of good judgment, was allowing drug users to be present in his car. In this vein, appellant's parents portrayed their son as someone who rashly placed himself in compromising situations because of his willingness to help those with problems.

After a brief recess, Rutherford—who by then had received a grant of testimonial immunity—was recalled as a witness. According to him, he had seen appellant and Bettina Grupe at the Treffpunkt Discotheque on the evening of November 7, 1979. When Rutherford's girlfriend, Olivia Herman, failed to arrive there at the promised time Rutherford asked Newman for a ride to the Gypsy Club in order to try to locate her. Rutherford hesitated to enter the Gypsy Club which "was off-limits to blacks"; so, at his request, appellant, after parking the car, went into the club for five to ten minutes to see if Olivia was there.

Rutherford testified:

During the time when he was downstairs Bettina Grupe took a package from the sun visor on her side of the car, the passenger's side of the car. She took it down, got a spoon and syringe from the glove compartment and prepared to make herself a shot. At this time she had the stuff in the syringe. I asked her what

was she doing. She said that she was going to shoot up. I said hey, let me get out of the car. I don't want nothing to do with it.

At this time Newman came back. Newman was getting ready to get in the car. I was getting ready to get out. He told me that Olivia wasn't there. I said to let me out. When I raised up, to get out, I looked—I guess it was to my left—I saw a car approaching. The car was going slow at first, and then it speeded up, I guess when it saw us.

They got out of the car and called Bettina by name and told her to get out of the car. They told us to get out and searched us and took us down to the police station.

Rutherford conceded that he "wasn't paying much attention" when he "saw Bettina Grupe take the stuff off the sun visor."

On cross-examination, Rutherford stated that appellant had seen Bettina Grupe "with the syringe in her hand," but had not said anything. "He acted like it was usual" and "just got in the car" without saying a word to her about it. Replying to questions by the military judge, Rutherford testified that earlier he had not seen Bettina "place anything . . . on the sun visor" or "in the glove compartment." Everything was already "in place" when he got in the car and Rutherford insisted that "I didn't know nothing about any drugs in the car, sir. If I would have known, I wouldn't have been there." He did not know whose jacket was in the rear seat of the car and had not seen anybody place it there. On redirect, the witness denied that any of the heroin in the car or the syringe or needle had belonged to him.

In addition to this testimony the defense offered a stipulation of fact that the two medicine bottles found in the car contained legitimate prescription drugs. Neither appellant nor Bettina Grupe was called as a witness.

## II

In his instructions on the elements of the offenses charged, the judge advised the court members

that care, custody, management and control are among the legal definitions of the term "possession." A person in possession is one who has the capability of controlling the property and keeping others from interfering with it. But, this does not mean that the substance must actually be in the hands of the accused, or on his person. But, possession may be established by the fact that the substance was found on the premises or in the place over which the accused exercised dominion and control.

Two or more persons may have the exclusive possession of property. One person may hold the actual possession of property for himself and others.

Now, bear in mind the possession in all three of these specifications must be knowing and conscious possession. You may find that is one of the key issues in this case. Let me give you an instruction as to that. Actual knowledge that the accused was in possession of a hypodermic syringe and needle, hashish and heroin in those three specifications, is an essential element of each one of those specifications. You may not find the accused guilty unless you find beyond a reasonable doubt that he knew that he was in possession of a hypodermic needle, hypodermic syringe, possession of hashish and possession of heroin. *One may not willfully and intentionally remain ignorant of a fact important and material to his conduct in order to escape the consequences of criminal law.*

*If you find from all of the evidence beyond a reasonable doubt that the accused believed that he had a hypodermic needle and syringe, hashish, and heroin in his possession and deliberately and consciously tried to avoid learning that these items were in the car in order to be able to say that he did not know that they were there, you may treat this as the deliberate avoidance of positive knowledge as the equivalent of knowledge.*

*In other words, you may find that the defendant had the required knowledge if*

*you find either that he knew he had the items I mentioned, or that he deliberately closed his eyes to what he had every reason to believe was the fact. I emphasize, though, that knowledge can not be established by demonstrating mere negligence, or even foolishness on the part of the accused.*

(Emphasis supplied).

■ To appellant's contention that the judge erred by instructing on the "[d]eliberate ignorance" theory of criminal liability, the Court of Military Review replied that "this theory" was "warranted by the evidence and correctly presented to the factfinders for their consideration." Unpublished opinion at 3. On the other hand, we agree with the dissenting judge that this theory—however useful in some cases—was inapplicable to the case at bar.

■ The proposition that under some circumstances "[d]eliberate ignorance" of a fact can create the same criminal liability as actual knowledge thereof is well supported by the cases cited by the court below. *See United States v. Aulet,* 618 F.2d 182, 190–91 (2d Cir.1980); *United States v. Batencort,* 592 F.2d 916, 918 (5th Cir.1979); *United States v. Callahan,* 588 F.2d 1078 (5th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Muscarella,* 585 F.2d 242, 252 (7th Cir.1978); *United States v. Eaglin,* 571 F.2d 1069, 1074 (9th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978); *United States v. Lamont,* 565 F.2d 212 (2d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). For example, in *United States v. Batencort, supra,* which concerned the importation and possession of a controlled substance, the Court of Appeals remarked that "[d]eliberate ignorance has been recognized as the equivalent of knowledge by this and other circuits." 592 F.2d at 918. In *United States v. Aulet, supra,* a prosecution for importation and possession of cocaine, it was stated:

This Court has recognized that in cases where knowledge is an essential element, specific knowledge is not always necessary; rather, purposeful ignorance may suffice. *United States v. Joly,* 493 F.2d 672, 675 (2d Cir.1974). *See also United States v. Dozier,* 522 F.2d 224, 226–27 (2d Cir.), *cert. denied,* 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975). In [*United States v.*] *Bright, supra,* 517 F.2d [584] at 587, we noted that a defendant is entitled to instructions on the question of conscious avoidance that balance the "high probability" test of knowledge of a given fact with its negation by actual belief in the nonexistence of that fact. An examination of the recent case of *United States v. Morales,* 577 F.2d 769 (2d Cir.1978), is helpful in determining the adequacy of conscious avoidance charges. In Morales we stated that the nature of the balancing language required would depend on the evidence in each case, while noting at the same time that in previous drug cases most charges required references to the defendant's conscious avoidance *and* actual belief. 577 F.2d at 774 n. 4. We also noted our approval of an instruction on conscious avoidance drawn from the Model Penal Code § 2.02(7) which "serve[s] to focus the jury's attention on the extent of the defendant's actual knowledge and to assure that a conviction is not based on mere negligence, foolishness or stupidity." 577 F.2d at 775 n. 6. The instruction referred to originated in *United States v. Valle-Valdez,* 554 F.2d 911 (9th Cir.1977), where the Ninth Circuit found a charge deficient because it did not apprise the jury that conscious avoidance was culpable only if the defendant was aware of the high probability that he was transporting drugs. The principle to be gleaned from these cases is that a conscious avoidance charge must include references to a purposeful avoidance of the truth, *Dozier,* 522 F.2d at 227; an awareness of high probability, *Morales,* 577 F.2d at 774; and the absence of defendant's actual belief in the nonexistence of the crucial fact, *Bright,* 517 F.2d at 587.

618 F.2d at 190–91.

■ Thus, the theory of "[d]eliberate ignorance" may be invoked by the Govern-

ment for such purposes as prosecution of a drug courier who claims to have been unaware of the nature of the substance he was transporting. However, as noted by Judge O'Donnell's dissent in the court below, "it was not applicable to the facts of the instant case," for neither the prosecution nor defense evidence tends to suggest that appellant deliberately avoided any knowledge concerning the contents of his car. Unpublished opinion at 5. The Government's position was that, in light of the location of the various contraband items in appellant's car, Newman must have knowingly possessed those items—even if that possession may have been shared with Fraulein Grupe. Since appellant did not take the stand or offer other evidence to establish that he lacked knowledge about the presence of the drugs, syringe, and needle, there was never any occasion to consider whether he was ignorant because he had deliberately blinded himself to certain facts. The theory of "[d]eliberate ignorance" might have been applied more logically in a prosecution of Rutherford, who testified he had not been "paying attention" to certain incriminating events. However, as to Newman, the instruction on "[d]eliberate ignorance" only invited the court members to speculate on a possibility not raised in any way by the evidence.

Judge O'Donnell concluded that "[n]ot only were the instructions inapposite, but in my opinion they were prejudicial as well." *Id.* at 6. Therefore, he would have set aside the findings of guilty as to the charges relating to possession of heroin and drug paraphernalia, although he would have affirmed appellant's conviction on the charge involving possession of the hashish found in his jacket. We conclude, instead, that the instruction on "[d]eliberate ignorance" was so obviously irrelevant to the evidence before them that the court members would have disregarded it entirely and would not have been misled into convicting appellant when otherwise he would have been acquitted. *Cf. United States v. Vanzandt,* 14 M.J. 332, 344 n. 15 (C.M.A.1982). On that premise, we conclude that the instructional error did not taint any of the findings of guilty.

III

The convening authority who appointed the members of the court-martial and referred the charges for trial, also took the post-trial action. Appellant now insists that, since this official granted immunity to Rutherford so that he might testify as a *defense* witness, he was disqualified to participate in appellate review of the case.

In *United States v. Albright,* 9 U.S.C. M.A. 628, 26 C.M.R. 408 (1958), the accused was charged with rape and sodomy, for which a co-accused, Cates, had already been tried and convicted.

Through the testimony of the prosecution's witness, Cates, it was brought out on cross-examination by defense that Cates had been promised a reduction in sentence if he would agree to testify against the accused. It was additionally revealed that the staff judge advocate negotiated this agreement with the witness and that the witness received a personal assurance from the staff judge advocate he would recommend a sentence reduction. This same staff judge advocate reviewed the accused's conviction in accordance with the direction for review set out in Article 61, Uniform Code of Military Justice, 10 U.S.C. § 861.

Over Judge Latimer's dissent, it was held that through his actions prior to trial, "the staff judge advocate ... became associated with the prosecution and, as a consequence, the accused was deprived of an impartial post-trial review." *Id.* at 632, 26 C.M.R. at 412 (footnote omitted).

The disqualification of a convening authority to act on a case in which he has granted a witness immunity from prosecution was recognized in *United States v. White,* 10 U.S.C M.A. 63, 27 C.M.R. 137 (1958), where our Court observed:

While the staff judge advocate merely presents his opinion to the convening authority (Article 61 of the Code, supra, 10 USC § 861), it is the convening authority who is by law empowered to act on the

**480**

record (Articles 60, 62, 63 and 64, of the Code, supra, 10 USC §§ 860, 862, 863 and 864). Whether the fact is that the convening authority actively sought out the witness or the staff judge advocate did so with his concurrence, the grant of immunity was given by the convening authority. This involves him in the prosecution of the case to an extent where there is at least some doubt of his ability to impartially perform his statutory duty. He must weigh the evidence, pass on the credibility of witnesses and satisfy himself from the evidence that the accused is guilty beyond a reasonable doubt. It is asking too much of him to determine the weight to be given this witness's testimony since he granted the witness immunity in order to obtain his testimony. This action precludes his being the impartial judge he must be to properly perform his judicial functions.

*Id.* at 64, 27 C.M.R. at 138.

In a forceful dissent, Judge Latimer argued:

To grant immunity is purely an official act that falls upon a convening authority by virtue of his assignment. His position is substantially similar to that of judges in civilian courts who, in many jurisdictions, must approve or consent to grants of immunity before they become valid. The purpose of the grant is merely to remove the bar of self-incrimination which closes the mouth of one who is known to have some information relating to the offense. The interest of the law is to ascertain the truth. It is not necessary that a convening authority, to make those objectives attainable, have a fixed opinion on the veracity of a witness. On the contrary, he could not possibly make that determination until the person who received the grant had testified under oath, been cross-examined, and subjected to the tests of credibility and balanced against any witnesses testifying in opposite vein. It should be obvious that the witness

starts under a cloud of unreliability, for he is himself a party to the crime and there is a natural tendency to reject the testimony of an admitted criminal. About all this case accomplishes is to discourage a commander from performing administrative duties which are calculated to permit the court-martial to ascertain all of the facts.

*Id.* at 66, 27 C.M.R. at 140.

The doctrine of *White* was extended still further in *United States v. Sierra-Albino,* 23 U.S.C.M.A. 63, 48 C.M.R. 534 (1974). There the Court concluded that the staff judge advocate was disqualified "to review, and the convening authority to act upon, a court-martial in which an essential witness has received substantial clemency at the hands of a subordinate commander in return for his testimony against the accused." [2] *Id.* at 64, 48 C.M.R. at 535. Citing *White* and later precedents, the Court observed: "It is well-settled that the convening authority may not involve himself in granting immunity or clemency to a Government witness and thereafter review or act upon the case." *Id.* at 65, 48 C.M.R. at 536.

Of course, when *White* was decided, our Court was dealing with immunity from prosecution. Indeed, at the time it was generally believed that only by granting immunity from prosecution could a witness be compelled to testify; apparently this was the only type of immunity contemplated by the 1951 and 1969 Manuals. *See* paras. 68*h* and 148*e,* Manual for Courts-Martial, United States, 1951; and para. 68*h,* Manual for Courts-Martial, United States, 1969 (Revised edition). Probably the perception of the majority in *White* was that a convening authority would be reluctant to grant such immunity unless he believed that the witness being immunized would give valuable and truthful testimony and that if a convening authority exchanged immunity from prosecution for testimony which proved to

---

**2.** This holding was recently distinguished in *United States v. Turcsik,* 13 M.J. 442 (C.M.A. 1982), where there was absent "some direct unattenuated causal relationship between the grant of clemency or immunity and the subsequent action by the convening authority." *Id.* at 445.

be unpersuasive, his own judgment might be criticized for making such a poor bargain. Thus, there was at least some basis for the majority in *White* to assume that, in acting on a case, a convening authority might feel under a subtle pressure to give special weight to testimony given by a witness to whom he had granted immunity from prosecution.

In 1964, the Supreme Court ruled that a witness could be compelled to testify without receiving transactional immunity (immunity from prosecution for offenses revealed in his testimony). Instead, it would suffice if he were assured immunity from use against him in any subsequent prosecution of any testimony he gave or of any evidence derived from that testimony. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). This immunity—which does not preclude prosecution for offenses revealed in the witness' testimony so long as the Government does not rely for its evidence on that testimony or on the fruit thereof—is often referred to as *testimonial immunity* or *use immunity.*

In response to the Supreme Court's ruling, Congress gave explicit statutory recognition to testimonial immunity as the usual means for compelling testimony by witnesses who invoke their privilege against self-incrimination (*see* 18 U.S.C. §§ 6001–6005) and, in turn, this legislation has been held constitutional. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

■ While some questions have been raised as to the basis for granting testimonial immunity in connection with trials by court-martial, *see United States v. Villines,* 13 M.J. 46, 59 (C.M.A.1982) (Everett, C.J., dissenting), on one ground or another our Court has clearly authorized such immunity. *Id.; see also United States v. Martin,* 13 M.J. 66 (C.M.A.1982). We have recognized that testimonial immunity may be granted by a convening authority at the instance of the defense as well as the Government.

Moreover, we have emphasized that, in determining whether to grant immunity under such circumstances, a convening authority should not seek to determine the credibility of the testimony and should not deny a defense request that a witness be immunized because he does not consider the witness to be credible. *United States v. Villines, supra.*

■ Mil.R.Evid. 607 explicitly repudiated the notion that a party who calls a witness and offers his testimony vouches for his credibility.[3] In so doing, this Rule has helped remove any basis for an assumption that, by making evidence available through a grant of immunity, a convening authority is expressing his personal view as to the credibility of the immunized witness.

Contrary to the premise on which the rule in *United States v. White, supra,* was based, the convening authority in the case at bar certainly did not in any way imply a belief in Rutherford's credibility by granting him testimonial immunity at the request of the defense. At the time of the immunity grant, the convening authority probably had little, if any, idea as to the probable content of this witness' testimony. Moreover, we cannot perceive how allowing him to act on the record in the present case creates "the appearance of evil" with which *White* was also concerned.

Indeed, if the convening authority were disqualified in the present case, it would seem anomalous in most cases where a plea of not guilty has been entered to allow the original convening authority to take post-trial action. Generally, a convening authority—or, at least, his staff judge advocate—will be aware of the prospective testimony of government witnesses at the time that he refers the case to trial; then, when he reviews the case, he usually will have to decide whether the testimony of those witnesses given at trial was credible and supports the conviction. Under such circumstances a convening authority presumably would be much more predisposed to believe

---

**3.** Even though the Military Rules of Evidence took effect after the case at bar was tried, we believe the policy stated in Mil.R.Evid. 607 nonetheless is relevant to the issue at bar.

the government witnesses than the convening authority in the present case would be inclined to credit Rutherford's testimony. Nonetheless, Congress obviously contemplated that a convening authority would be free to act on a case under such circumstances.[4]

■ Although we have discussed the convening authority's disqualification in terms of the facts of the case at bar, our holding need not be limited to these facts. Instead, we conclude that a grant of testimonial immunity—whether to a government or defense witness—does not affect the impartiality of a convening authority or his right to review the record of trial. Granting a witness immunity from subsequent use against him of his testimony or its fruit simply does not predispose a convening authority to a belief that the immunized witness is credible; nor in our view, does it reasonably create even an appearance of doing so.

By rejecting the disqualification of the convening authority in connection with grants of testimonial immunity—which should be far more common in the future than grants of immunity from prosecution—we also eliminate some of the disadvantages that result from appointment of a substitute convening authority to take post-trial action. Among these are delay of the action while the substitute is being appointed and the record of trial is being transmitted to him. Moreover, frequently the substitute convening authority is located at considerable distance from the place where the offenses were committed and he may be very unfamiliar with the accused and the conditions in the command where the accused is stationed. While the substitute convening authority can obtain information about the accused, we believe that in many instances he will be more hesitant to take clemency action or grant other relief to an accused than would be the convening authority who initially referred the case for trial.[5]

Since the present case involves only testimonial immunity, we need not consider under what circumstances, if any, a grant of transactional immunity or sentence reduction may disqualify a convening authority from performing appellate review.[6] Obviously, the key inquiry is whether his actions before or during the trial create, or appear to create, a risk that he will be unable to evaluate objectively and impartially all the evidence in the record of trial—including the testimony of any witness who has been immunized, granted a sentence reduction, or given other concession.[7]

## IV

Accordingly, the decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

4. Military justice has occasionally been criticized because the same official who refers a case to trial then takes the initial post-trial action. However, the force of this criticism is blunted because a servicemember enjoys several unique safeguards in the appellate review of his case. These safeguards, which in serious cases include review of facts and sentence appropriateness by Courts of Military Review, are unparalleled in civilian judicial systems. In any event, we perceive no reason why the convening authority in the present case would be, or would appear to be, less impartial than in other cases where he performs appellate review functions.

5. Inevitably a commander will be reluctant to take clemency action which he believes may be perceived as eroding the authority of a fellow commander.

6. Where a sentence reduction has been granted, the convening authority is not disqualified if there is "no *quid pro quo* in the awarding of clemency related to ... [the witness'] testifying." *United States v. Turcsik, supra* at 445.

7. To facilitate appellate review of any claim concerning disqualification, the review of the staff judge advocate should refer to any participation of the staff judge advocate or convening authority in granting immunity, whether testimonial or transactional, or sentence reduction for any witness. *See generally United States v. Turcsik, supra.*