OPINION OF THE COURT
GRAVELLE, Senior Judge:
In accordance with his pleas, the appellant, Major Ozie Stanley, was convicted of consensual sodomy, false swearing, and adultery, in violation of Articles 125 and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 925 and 934 (1988). Contrary to his pleas, a general court-martial consisting of members also convicted the appellant of rape, in violation of Article 120, UCMJ, 10 U.S.C. § 920 (1988). The convening authority approved the adjudged sentence of dismissal, confinement for 18 months, and forfeiture of $1000 pay per month for 18 months.
The appellant asserts that the evidence is not legally and factually sufficient to support his conviction for rape. We hold that it is.
I. Facts.
The appellant was accused of unlawfully entering the room of a female captain and of forcibly sodomizing and raping her. He was also accused of lying about the incident under oath to the police. At trial, he providently pleaded guilty to adultery, consensual sodomy, and false swearing. The government thereafter attempted to prove the unlawful entry, forcible sodomy, and rape. The members convicted the appellant only of rape.
Both the victim and the appellant testified at trial. Their testimony is similar in many respects; however, it reflects some significant differences regarding the flow of events leading up to and during the sexual encounter. With some equivocation, he testified the intercourse was consensual; she said it was not.
The appellant and the victim, both on tours of duty in Korea unaccompanied by their spouses, lived in the same bachelor officer’s quarters (BOQ) at Camp Walker, Korea. They knew each other casually, and had never dated. Learning that he was to complete his tour of duty and leave Korea within a few weeks, she negotiated to buy his automobile. While reregistering the vehicle, he made two suggestive comments to her and then asked to have sex. She later testified she told him no; he testified she looked at him, gave him a sly smile, and said nothing. Later that evening, she visited his BOQ room briefly. He testified that during the visit she put her hand in his pocket and fondled his penis; she denied doing so.
Several days later, on the night of the incident, she went with friends to a local club. The appellant dropped by and gave her the keys to her car, spoke briefly with her, and departed the club. Later that night, after she returned to her BOQ, she brought him and another officer some cake as a farewell gesture to the appellant, who was due to depart Korea the next day. An hour or so later, he briefly visited her room to borrow the keys to the car. She then went to bed but did not lock the door to her room.
Some time after 0400, she was awakened when she felt someone touching her feet and pulling off her underwear. It was the appellant. She testified that although still groggy with sleep, she resisted and said, “no,” to his advances. Nevertheless, he succeeded in sodomizing her and engaging in foreplay preparatory to intercourse.
Just after the sodomy, at about 0430, the telephone rang. The appellant stopped his sexual activity, and she answered the phone which was located beside the bed. She remained in the bed with the appellant’s legs over hers, spoke to the caller for a minute, but said nothing about what was happening. Her caller offered to stop by her BOQ in a few minutes to drive her to Seoul, as they had previously discussed. She declined the offer of a ride, and then hung up.[1] Thereaf *671 ter, the appellant resumed his sexual activity, and about an hour and a half later, succeeded in having sexual intercourse with her.
Afterward, she went into the bathroom and cleaned up. She then exited the bathroom and got dressed, gave him her forwarding address (she did this, she testified, to get rid of him), and they left the apartment together between 0600 and 0630. She went to work. At about 0900, she told another officer about the attack. That afternoon that officer convinced her to report the attack to the Criminal Investigation Command (CID).
Agents of the CID apprehended the appellant that afternoon at Kimpo Airport as he was preparing to board his flight to the United States. He gave three voluntary statements to police agents. In the first statement, he admitted trying to kiss the woman, and said that after initial resistance, she willingly fondled him and engaged in intercourse with him. He denied any sodomy. In the second statement given nine hours later, he admitted the sodomy and admitted that his earlier denial of sodomy was a lie. He elaborated on her expressions of reluctance but he persisted in saying the intercourse was consensual. The next day, in a third statement, he again changed his story. In this version, he described how the woman flirted with him for several weeks before the incident. He also altered his story of the foreplay leading up to the intercourse and admitted that the intercourse was by force and without her consent. He acknowledged that she had said, “no,” and had resisted at different times during the sexual encounter, and conceded that the assault was a rape “in the technical sense.”
Both parties testified at trial that during the encounter she indicated “no” as many as seven times, and that she moved her body repeatedly to frustrate his penetration. She testified that she pushed him and covered her vaginal area so he could not enter her, tried to talk him out of it by reminding him of his family, cried, and bit him on the shoulder. She also testified that he held her arms down, slapped her at least twice to intimidate her, and pulled her hair, and held her by the wrists and ankles at various times.
In his testimony, the appellant admitted to the intercourse and to some of the woman’s manifestations of reluctance to engage in intercourse. While acknowledging that she had initially expressed reluctance, he testified that her overall actions convinced him that the sexual activity was consensual on her part. He testified that he did not stop despite her protests because he “saw this as nothing but her playing ... some little adolescent game.” When asked why he believed the sexual intercourse not to be forcible, he testified:
Because of the flirtations that have been going on, for one. There was always some little innuendo of — -you keep your body in good condition for a man your age. Both of us are the same age, and during the acts, there’s the sly smiles, the rubs, the— and the no’s are not forceful nos. You — I think we know when a no is a no. I know when no means no, and when no is not the meaning that is normally associated with that word____ My only thing is I never understood what this was all about____ I made a very big and bad tactical error in judgement.
The appellant also testified he was misled by police officials as to the definition and nature of rape, and thereby attempted to explain away his admission to “technical” rape in his third sworn statement.
II. Law.
Article 120, UCMJ, provides that: “Any person subject to this chapter who commits an act of sexual intercourse by force and without consent is guilty of rape and shall be punished as a court-martial may direct.”[2] The elements of rape are: (1) That the accused committed an act of sexual intercourse with a certain person; and (2) that the act of sexual intercourse was done by force and without consent. Only the second element of rape is at issue in the case before us.
*672 We look to the “totality of the circumstances evidenced in the record” to determine if the element of force and lack of consent has been proved. United States v. Webster, 40 M.J. 384, 386 (C.M.A.1994); United States v. Bonano-Torres, 31 M.J. 175, 179 (C.M.A.1990); United States v. Henderson, 4 U.S.C.M.A. 268, 15 C.M.R. 268, 273 (1954). “[T]he level of force need only be ‘more than the incidental force involved in penetration[.]’” Webster, 40 M.J. at 386 (quoting Bonano-Torres, 31 M.J. at 179). “The lack of consent required ... is more than mere lack of acquiescence.” Manual for Courts-Martial, United States, (1994 Edition), Part IV, para. 45(c)(1)(b) [hereinafter MCM]. Consent may be inferred if a victim “in possession of her mental and physical faculties fails to make her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances....” Id,; Bonano-Torres, 31 M.J. at 179. Such inference is permissive, and, by its very nature, depends on the circumstances. See United States v. Watson, 31 M.J. 49, 52-53 (C.M.A.1990). The U.S. Court of Military Appeals[3] in Bonano-Torres “expressly declined to adopt an ‘inflexible rule establishing resistance as a necessary element of rape.’ ” United States v. Webster, 40 M.J. at 386 (citations omitted). Resistance, or lack thereof, by the victim is simply part of the “totality of circumstances” relevant to the existence of force and lack of consent. From such evidence, or lack thereof, “the finder of fact may draw inferences as to the victim’s state of mind on the factual issue of consent ... and the accused’s state of mind regarding the affirmative defense of mistake of fact.” Bonano-Torres, 31 M.J. at 178.
“Mistake of fact” is a defense recognized in military criminal law. Rule for Courts-Martial 916(j) [hereinafter R.C.M.]. With a general intent crime, such as rape, the mistake of fact “must have existed in the mind of the accused and must have been reasonable under the circumstances.” R.C.M. 916(j) (emphasis added); United States v. Pierce, 40 M.J. 601, 605 (A.C.M.R. 1994); United States v. Yarborough, 39 M.J. 563, 564 (A.C.M.R.1994). When the defense of mistake of fact is raised, the government must prove that the mistake is either not honest or that the mistake is not reasonable. United States v. Langley, 33 M.J. 278, 281-82 (C.M.A.1991); Yarborough, 39 M.J. at 564.
In reviewing a case for legal sufficiency, the standard of review is whether, viewing the evidence in a light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On the other hand, when testing for factual sufficiency, this court must, after weighing the evidence and making allowances for not having seen or heard the witnesses, be convinced that an accused is guilty beyond a reasonable doubt. United States v. Turner, 25 M.J. 324 (C.M.A.1987). In cases where witness credibility plays a critical role in the outcome of trial, this court should hesitate to second-guess the trial court’s findings. United States v. Albright, 9 U.S.C.M.A. 628, 26 C.M.R. 408 (1958). See generally United States v. Niles, 39 M.J. 878, 880-81 (A.C.M.R.1994), aff'd after Dubay hearing, United States v. Niles, Army 9200448 (Army Ct.Crim.App. 13 Mar. 1995) (unpub.).[4]
III. Analysis
The appellant contends that the act of sexual intercourse was accomplished without force and with the woman’s consent. Further, he contends that even if she did not actually consent, he reasonably and honestly believed that she did.
More specifically, in his brief and in oral argument, the appellant’s counsel contends that the woman’s contact with the appellant *673 in the days before the incident in question led him to believe that she would be receptive to his advances. Further, counsel argues that when the appellant entered the woman’s unlocked room, removed her clothes, fondled and sodomized her, and had sexual intercourse with her, she failed to manifest her lack of consent, verbally or physically. Counsel emphasizes that she could have resisted more forcefully, that she suffered no physical injuries indicative of force or resistance, and failed to take advantage of a phone caller who might have provided assistance.
The appellant asks us to believe him and to discredit the woman’s testimony regarding certain disputed events, such as whether she fondled his penis several days before the incident in question. By their finding of guilty, it is evident that the court members in the present case believed the woman’s version of these events and disbelieved the appellant.
Utilizing our unique fact-finding powers and responsibility under Article 66(c), UCMJ, we see no reason to disturb their credibility determination. We have taken into consideration that the court members saw and heard the witnesses and weighed the relative probabilities of their testimony. We have also considered that the appellant changed his description of events several times. In short, our independent review of the facts convinces us that the testimony of the woman is far more credible than that of the appellant.
Having made our determination of credibility, we must next determine the legal and factual sufficiency of the evidence, focusing on the second element of rape; that is, force and lack of consent.
We find that the victim manifested her lack of consent to intercourse by repeatedly saying “no,” by asking the appellant to consider his family, by squirming, by crying, by pushing and biting him, and by covering her pelvic area with her hands. We also find considerable evidence of force in the protracted nature of the struggle as well as his repeated pinning of the woman to the bed and his holding her wrists and ankles, pulling her hair, lifting her legs, and slapping her. After a time, she testified, she became “too tired. I was just worn out. I couldn’t resist it anymore.” Thus, intercourse was accomplished not by ardent seduction but by relentless assault.
We reject the notion, implied by the appellant’s counsel during oral argument, that bodily harm to the victim is necessary to show resistance and thereby establish either force or lack of consent. We note, again, that resistance by the victim is not an element of rape. In Webster, the U.S. Court of Military Appeals discussed the evolution of the law of rape with particular focus on necessity of resistance and the relationship between resistance and lack of consent. “The law has outgrown the resistance concept____” People v. Bermudez, 157 Cal.App.3d 619, 624,203 Cal.Rptr. 728, 731 (1984) cited with approval in Webster, 40 M.J. at 386.
The woman here might have been able to obtain help over the phone, and might have offered more physical resistance. These factors are relevant, but not, in this case, dis-positive. The issue is not whether we can, with the luxury of detached contemplation, imagine courses of action by which the woman might have successfully resisted or otherwise foiled her attacker. Rather, the issue is whether, under the totality of circumstances, intercourse was effected by force and without her consent. For all the reasons stated, we are satisfied that this second element of rape was established.
Even assuming that the appellant had in fact an honest but mistaken belief that the woman consented, we are satisfied that such belief was not reasonable under the circumstances. The appelate defense counsel point to certain actions and “body language” by the woman in arguing that the appellant reasonably believed she consented.[5] *674 He argues, in effect, that “There must be a line drawn by the woman, and her manifestations of lack of consent must be clear.”
We think the word “no” draws a clear line. While it might happen that one who says “no” could erase that line with nonverbal signals and actions, we are satisfied that that did not happen here. The woman’s actions were, for the most part, unmistakably consistent with lack of consent. That a few of her actions might be viewed as ambiguous does not give rise to a reasonable belief that she consented.
Overall, the evidence reflects that the appellant was determined to engage in intercourse regardless of the woman’s consent, and could not reasonably have been mistaken as to the existence of that consent. The appellant may have hoped the woman would be a willing partner, but hope does not equal a reasonable mistake of fact.
We have also reviewed the appellant’s remaining assertions of error raised by appellate defense counsel and find no merit in them.
The findings of guilty and the sentence are affirmed.
Chief Judge COOKE and Judge ECKER concur.

. When asked at trial why she did not alert the caller to her situation, she testified she was *671 afraid and embarrassed, and "thought she could handle [the situation].”

. An amendment of Article 120, UCMJ, which was effective 23 October 1992, made the offense gender-neutral and eliminated the requirement that the victim not be the wife of the perpetrator.

. Renamed by Congress the U.S. Court of Appeals for the Armed Forces effective 5 October 1994. National Defense Authorization Act for Fiscal Year 1995, Pub.L. No. 103-337, § 924(a), 108 Stat. 2663, 2831.

. On 5 October 1994 the Congress changed the name of this court from the Army Court of Military Review to the Army Court of Criminal Appeals. National Defense Authorization Act for Fiscal Year 1995, Pub.L. No. 103-337, § 924(b), 108 Stat. 2663, 2831.

. In his brief and in oral argument, appellate defense counsel rely heavily upon this court’s 1994 opinion in United States v. Pierce, in arguing that the evidence is insufficient.
At the outset, we note that the appellant's counsel misreads Pierce insofar as he suggests that we found the evidence both legally and factually insufficient. In Pierce, we found the *674 evidence legally sufficient, but set aside Pierce’s conviction of rape for factual insufficiency because we found that the government had failed to disprove beyond a reasonable doubt the defense of mistake of fact. Id., 40 M.J. at 604-06.
We find significant differences between Pierce and the case before us. In Pierce, unlike the present case, there was no evidence that Pierce struck the victim. Moreover, in Pierce at one point, the victim "French kissed” Pierce, a factor which we found very significant; here, at no point did the woman engage in conduct so clearly encouraging to the accused. In Pierce, the accused made no detailed statement after the incident and did not testify at trial. Here, the accused testified at trial after making several self-contradictory statements, all of which undermined his claim of reasonable mistake of fact. We believe that the facts in the case before us are more closely akin to — and we believe stronger than — those in United States v. Webster, 40 M.J. 384, 386 (C.M.A.1994).